[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 21, 2010
JOHN LEY
ACTING CLERK

No. 09-11088
Non-Argument Calendar

_____

D. C. Docket No. 08-60207-CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JACQUES HERNES TELCY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 21, 2010)

Before BLACK, HULL and ANDERSON, Circuit Judges.

PER CURIAM:

After a jury trial, Jacques Hernes Telcy appeals his convictions for

possession with intent to distribute cocaine and crack cocaine, in violation of 21 U.S.C. § 841(a)(1); possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). After review, we affirm.

## I. BACKGROUND

Acting on a tip from a confidential informant ("CI"), officers pulled Telcy over in an apartment complex parking lot and eventually searched his nearby apartment, where they found drugs and a firearm. Telcy moved to suppress his statements to investigators and the physical evidence found in his apartment.

The district court held a suppression hearing at which Detective Osvaldo Tianga recounted the circumstances of Telcy's arrest and the search. According to Detective Tianga, on August 1, 2008, he received information from a CI that a 30-year-old black male of medium build would be driving a Ford Edge containing contraband. According to the CI, with whom Tianga had worked and who had proven reliable in the past, the man lived at the New River Cove Apartments in Dania, Florida. Tianga and three other federal and state officers spotted Telcy, who was driving a Ford Edge and fit the description given by the CI. The officers followed Telcy into the New River Cove apartment complex parking lot and pulled him over.

As he approached Telcy's car, Tianga smelled the odor of marijuana. Because Telcy put his hand into his pocket, Tianga handcuffed him for officer safety. When Tianga asked if Telcy had marijuana, Telcy said: "No. You can look all you want. I just came from the bank." Upon searching the car, Tianga found a half-smoked marijuana cigarette and a trash bag containing cellophane bags caked in a residue. A field test indicated that the residue was cocaine. Telcy denied knowledge of the drugs or cellophane and stated that he was just at the apartment complex to pick up a girl. At that point, Tianga advised Telcy of his Miranda rights. When Tianga confronted Telcy about the cellophane and asked whether a search of his apartment would yield anything further, Telcy pointed toward a door in the apartment complex. According to Tianga, Telcy stated: "You could search my apartment. That's it. You know, it's right there."

The officers entered Telcy's apartment and conducted a safety sweep, at which time they noticed a digital scale in plain view, coated in cocaine residue. Beneath the scale were sandwich bags and about 70 grams of cocaine and crack cocaine. Further searching revealed a locked safe in Telcy's bedroom closet. Tianga returned and asked Telcy where the key for the safe was, and Telcy responded that it was on his key chain. Tianga took the keys from a table, opened the safe, and found inside three-quarters of a kilogram of cocaine. Tianga also

3

found a firearm and a "kilo press," used to shape cocaine bundles. Tianga pried open a plastic compartment within the safe, but he found nothing further. Telcy was re-advised of his <u>Miranda</u> rights, and he said that the apartment was rented for him under a female acquaintance's name, but that it was primarily his residence. When asked to sign a written consent form, Telcy stated that he wanted to contact an attorney.

On cross-examination, Tianga recounted that Telcy indicated his apartment by pointing, and he initially misidentified or misunderstood the apartment to which Telcy had pointed. On redirect examination, Tianga stated that he initially thought Telcy deliberately misidentified his apartment, but Telcy later clarified which unit was his, saying to Tianga, "I told you where the apartment is. It's right there."

Telcy also took the stand and testified that he did not consent to the search of either his apartment or his car. On cross-examination, however, Telcy stated that he gave officers permission to search the car for his bank receipt.

The district court denied Telcy's motion to suppress the fruits of the search, but granted the motion to suppress any statements made after he invoked his right to counsel. The district court stated that it had considered Tianga's and Telcy's testimony and "determined [the] credibility of witnesses." The district court recited the facts crediting Tianga's version of events. Specifically, the district

4

court found that "Telcy consented to the search of his apartment and indicated that the keys were on his key chain. When the police went to the wrong apartment, Telcy pointed out the correct apartment, #102." The district court concluded that "Telcy voluntarily consented to the search of Apartment #102."

After trial, a jury convicted Telcy of possession with intent to distribute crack cocaine (Count One), possession with intent to distribute cocaine (Count Two), both in violation of 21 U.S.C. § 841(a)(1), possession of a firearm in furtherance of a drug trafficking offense (Count Three), in violation of 18 U.S.C. § 924(c)(1), and possession of a firearm by a convicted felon (Count Four), in violation of 18 U.S.C. § 922(g)(1). The district court sentenced Telcy to life imprisonment on Count One, concurrent 235-month sentences on Counts Two and Four and a consecutive 60-month sentence on Count Three. Telcy filed this appeal.

## II. DISCUSSION

Generally, police officers must obtain a warrant supported by probable cause to justify a search under the Fourth Amendment. United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005). A search of property without a warrant and probable cause is constitutionally permissible if preceded by valid consent. United

5

States v. Dunkley, 911 F.2d 522, 525 (11th Cir. 1990).[1]

Telcy argues that the district court improperly credited Detective Tianga's suppression hearing testimony and failed to make a specific credibility finding. We disagree. The district court expressly stated that it had considered the credibility of both Tianga and Telcy and then credited the facts conveyed in Tianga's testimony. We must defer to the district court's credibility findings and accept the credited testimony "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002). Nothing in the record suggests Detective Tianga's testimony is improbable on its face. The district court did not clearly err in finding credible Detective Tianga's testimony that Telcy consented to the search of his apartment.

Further, Telcy has cited no precedent requiring the district court to give a detailed explanation of its credibility finding. Telcy's reliance on Gallego v. United States, 174 F.3d 1196 (11th Cir. 1999), is misplaced. In Gallego, this Court rejected a rule or presumption that, as a matter of law, a defendant must submit

_____

[1]"In reviewing a district court's ruling on a motion to suppress, we review findings of fact for clear error and the application of the law to those facts de novo." United States v. Martinelli, 454 F.3d 1300, 1306 (11th Cir. 2006). We construe the facts in this case in the light most favorable to the government, as it was the prevailing party in the district court. United States v. Newsome, 475 F.3d 1221, 1223-24 (11th Cir. 2007). We are not limited to a review of the evidence presented at the suppression hearing; instead, we may consider the entire record, including trial testimony. Id. at 1224.

additional corroborating evidence in order to be found credible. Id. at 1198-99.

Here, the district court applied no such rule.

Telcy also raises two new arguments on appeal, which we review for plain error. See United States v. Spoerke, 568 F.3d 1236, 1244 (11th Cir. 2009). First, Telcy argues that, even if he did consent, his consent was not voluntary, but the product of coercion.

The voluntariness of the defendant's consent to a search is a factual assessment and "depends on the totality of the circumstances." United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001). In evaluating voluntariness, we examine several factors, including the defendant's custodial status, "the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." Id. at 1281-82.

The record establishes that Telcy was in handcuffs and in custody following the discovery of contraband in his car. However, the officers did not employ any coercive tactics. The officers did not brandish their weapons and did not threaten Telcy or lie to him or otherwise unreasonably pressure him into acceding to their

7

request.[2]  Detective Tianga merely asked Telcy where his apartment was, whether they would find anything illegal inside and whether they could search.  Telcy identified his apartment and consented.  According to Detective Tianga, Telcy was fully cooperative with the officers, permitting them to search his car, directing them to the right apartment when they approached the wrong door and showing them where they could find the keys to his safe.  Although officers did not inform Telcy of his right to refuse his consent, this does not invalidate an otherwise valid consent.  See United States v. Taylor, 458 F.3d 1201, 1205 (11th Cir. 2006).

Telcy makes a generalized argument that his background (mainly his limited, tenth-grade education) undermined his ability to voluntarily consent, but does not identify how this constrained his ability to refuse or impaired his ability to appreciate the consequences of his consent.  Indeed, Telcy later refused to sign a written consent form, which demonstrates that he appreciated the consequences of the search and that his will was not overborne.  Given the totality of the circumstances, we find no error, much less plain error, in the district court's finding that Telcy's consent was voluntary.

---

[2]Although Telcy testified that one officer drew his gun as they approached him, Detective Tianga testified that officers did not draw their weapons until they entered the apartment. Crediting Detective Tianga's testimony over Telcy's, as it was permitted to do, the district court found that, as Telcy exited his vehicle, the officers approached, identified themselves as police officers, and told Telcy to remove his hands from his pants, that, at that point, the police still had not drawn their guns and that the officers drew their guns for the first time as they entered the apartment.

Telcy's second newly-raised argument is that, even if he gave the officers valid consent to search his apartment, the officers exceeded the scope of his consent when they searched the locked safe in his bedroom. Again, we find no error, plain or otherwise.

When a defendant gives a general statement of consent, the scope of the permissible search "is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." United States v. Street, 472 F.3d 1298, 1308 (11th Cir. 2006). Permission to search an area for narcotics "may be construed as permission to search any compartment or container within the specified area where narcotics may be found." United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992). Additionally, "[b]y describing the location of the keys which would provide entry into [a locked area], [a defendant] provide[s] additional evidence of his consent to the search." United States v. Milian-Rodriguez, 759 F.2d 1558, 1564 (11th Cir. 1985).

Here, Telcy gave the officers permission to search his apartment and did not limit the terms of the search to exclude the safe. Further, given the context of the requested consent, it was clear that further narcotics were the object of the search. Telcy watched as Detective Tianga conducted a field test, which yielded a positive result for cocaine, on the cellophane wrappers in his car. Detective Tianga

9

confronted Telcy about the cocaine-encrusted wrappers and asked if there would be anything else in his apartment.

Moreover, Detective Tianga asked Telcy where the keys to the safe were located. Even assuming he did not know earlier, Telcy knew then that Tianga intended to open the safe and examine its contents. Not only did Telcy fail to object to a search of the safe, he told Tianga where to find the key. In short, Telcy knew the object of the search and did not attempt to limit his consent. Under these circumstances, it was reasonable to believe Telcy's consent encompassed the safe in his bedroom.

For all these reasons, the district court did not err in denying Telcy's motion to suppress the evidence found in his apartment.[3]

**AFFIRMED.**

---

[3]Telcy's argument that the fruits of the search must be excluded because officers did not give him a Miranda warning before asking him to identify his apartment is foreclosed by United States v. Jackson, 506 F.3d 1358, 1360-61 (11th Cir. 2007) (concluding, based on United States v. Patane, 542 U.S. 630, 124 S. Ct. 2620 (2004), "that Miranda does not require the exclusion of physical evidence that is discovered on the basis of a voluntary, although unwarned, statement").