**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 9 MAP 2017 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court at No. 319 MDA 2015 dated |
| | : | August 19, 2016 Affirming the Judgment |
| v. | : | of Sentence of the Centre County Court |
| | : | of Common Pleas, Criminal Division, at |
| | : | No. CP-14-CR-2234-2013 dated |
| RANDY JESUS VALDIVIA, | : | January 23, 2015 |
| | : | |
| Appellant | : | ARGUED:  November 28, 2017 |

**OPINION**

**JUSTICE DONOHUE**                                      **DECIDED:  October 17, 2018**

This discretionary appeal addresses the scope of consent given by a motorist to law enforcement for the search of his vehicle.  For the reasons that follow, we conclude that the consent given by Appellant, Randy Jesus Valdivia ("Valdivia"), to Pennsylvania State Police Troopers Jeremy Hoy and David Long to search his van did not extend to a canine search occurring approximately forty minutes later.  A reasonable person in Valdivia's position would not have understood that he was consenting to such a search. We therefore reverse the decision of the Superior Court and remand the case for further proceedings consistent with this Opinion.

At approximately 4:30 p.m. on December 12, 2013, Troopers Hoy and Long were traveling together in a marked police cruiser on Interstate 80 in Centre County, Pennsylvania.  They drove behind Valdivia, who was operating a white minivan with a

Michigan plate. After about two miles, they observed Valdivia change lanes without using his turn signal and initiated a traffic stop on that basis.[1] Trooper Lang stood at the rear of Valdivia's vehicle while Trooper Hoy approached on the passenger side of the van and requested Valdivia's license, registration and proof of insurance. Valdivia responded that he was about to run out of gas and gave the trooper his license, issued in the State of Florida, and a rental agreement for the vehicle. Trooper Hoy noted that Valdivia was nervous and his hand was shaking when he handed Trooper Hoy the documentation, something the trooper said he "look[s] for in every traffic stop." N.T., 8/8/2014, at 9.

When asked, Valdivia explained that he was traveling to Union City, New Jersey to visit family. He told Trooper Hoy that he had originally planned to fly there from Fort Lauderdale, Florida, but his plane was rerouted to Detroit, Michigan. He missed his connecting flight to New Jersey and decided to drive the rest of the way. Trooper Hoy observed two large boxes wrapped in Christmas paper in the back of the van. Based on Valdivia's story, the trooper found it odd that the gifts had no "markings from an airliner," and were "not banged up." *Id.* at 11. He testified to his familiarity with the tactic of wrapping boxes containing drugs in Christmas paper during the holiday season for camouflage.

Additionally, Trooper Hoy found it strange that the rental agreement showed that Valdivia had rented the vehicle in Ann Arbor, Michigan, which was approximately thirty

---

[1] *See* 75 Pa.C.S. § 3334(a) ("Upon a roadway no person shall turn a vehicle or move from one traffic lane to another or enter the traffic stream from a parked position unless and until the movement can be made with reasonable safety nor without giving an appropriate signal in the manner provided in this section.").

miles away from the airport in Detroit. The rental agreement also indicated that it was a one-way rental, which the trooper stated he knew to be "common with … criminals traveling across the country" trafficking drugs. *Id.* at 15. Further, through his training and experience, Trooper Hoy was aware that drug traffickers often used the I-80 corridor to travel from Detroit to New York and surrounding areas.

Trooper Hoy returned to his vehicle and, as he did in every traffic stop, ran a record check on Valdivia. While he waited for the report on Valdivia's prior record, Trooper Hoy contacted State Police K-9 Officer Aaron Tiracorda to conduct the search of the vehicle with his canine partner, Tom.[2] Because Trooper Tiracorda was off duty at that time, he had to drive to the scene from his house, which was located approximately thirty miles away. When the record check returned, it revealed that Valdivia had previously been charged in Florida with possession with intent to deliver a controlled substance.

Troopers Hoy and Long approached Valdivia's vehicle together and asked him to step out of the car. Trooper Hoy explained the written warning Valdivia was receiving for failing to use his turn signal when changing lanes. After returning his documentation, Trooper Hoy asked Valdivia if he would answer a few more questions. Although Valdivia again stated that he needed to go get gas in his van, he agreed to

---

[2] Trooper Hoy testified that he did not call Trooper Tiracorda to come to the scene until after he obtained Valdivia's consent to search the vehicle. N.T., 8/8/2014, at 54. The suppression court found, however, consistent with Trooper Long's testimony, that Trooper Hoy called for the K-9 unit before obtaining Valdivia's consent. Suppression Court Opinion, 9/9/2014, Findings of Fact ¶ 12; *see also* N.T., 8/8/2014, at 79 (Trooper Long testifying that calling for a K-9 unit before obtaining consent to search was "normal procedure" because "once we believe that we have reasonable suspicion, then we contact the K-9 for time purposes," and explaining that there has been the need to "call[] a K-9 off on many occasions.").

answer additional questions. Trooper Hoy asked Valdivia why he did not fly directly from Fort Lauderdale to either New York City or Newark, New Jersey. In response, Valdivia altered his original story, stating instead that he flew to Detroit to visit a friend (a linebacker for the Detroit Lions). Valdivia indicated that he had arrived in Detroit around 11:00 p.m. on December 11 and then left the next morning around 9:00 a.m. to rent the vehicle and drive to New Jersey. Trooper Hoy asked about the location of the rental agency, and Valdivia explained that when he arrived at Detroit's airport, all of the rental companies were closed, and so he went to Ann Arbor the next morning to rent the vehicle.

Upon hearing this new version of events, Trooper Hoy asked for Valdivia's consent to search the vehicle. Valdivia gave his verbal consent, and thereafter signed a written consent presented to him by Trooper Long.[3] Although it was Trooper Hoy's "standard practice" to "keep the individual informed of what's happening [during] a traffic stop," he could not say that he specifically informed Valdivia either that a canine (and not a human) would be conducting the search or that he would have to wait until Trooper Tiracorda arrived with Tom for the search to occur. *Id.* at 55-56.

It was a cold evening, and Valdivia accepted the troopers' offer for him to sit in the back of the police cruiser while he waited. Trooper Tiracorda and Tom arrived approximately forty minutes later, at 5:40 p.m. Prior thereto, neither Trooper Hoy nor

---

[3] The Commonwealth did not admit the written consent form into evidence. The only information from the written consent form that was testified to at the suppression hearing was that Valdivia "checked the box" indicating that the car he was driving was a rental vehicle, he signed the form and placed his address at the bottom, and that the form states that an individual does not have to give consent to search. N.T., 8/8/2014, at 18, 81-82.

Trooper Long conducted a search of Valdivia's vehicle. Upon the arrival of Tom and Trooper Tiracorda, the troopers removed the two Christmas packages and a suitcase from the back of the van. Tom alerted on one of the two boxes, and subsequently indicated on the same box.[4] After Trooper Tiracorda relayed this information to the other troopers, they opened both boxes and found clear, vacuum-sealed packages containing individually wrapped bags of suspected marijuana. The trooper seized the boxes, as well as a mobile smartphone and tablet, and arrested Valdivia. The total weight of the suspected contraband was approximately twenty pounds. Subsequent testing confirmed that it was marijuana.

The Commonwealth charged Valdivia with possession of a controlled substance, possession of a controlled substance with intent to deliver, and possession of drug paraphernalia.[5] Valdivia filed a timely omnibus pretrial motion seeking, inter alia, suppression of all evidence obtained as a result of the search of his vehicle. Of relevance to this appeal, Valdivia alleged that his consent was not voluntarily given, and that even if it was voluntary, the canine sniff and the lengthy delay exceeded the scope of any purported consent he gave. He argued that all evidence obtained from his vehicle must be suppressed pursuant to the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.

---

[4] According to Trooper Tiracorda's testimony at the suppression hearing, "Alert behavior is … a change in posture, an increased respiration when the dog first encounters the odor he's trained to detect. The indication is a trained behavior that pinpoints the source of the odor." N.T., 8/8/2014, at 94.

[5] 35 P.S. § 780-113(a)(16), (30), (32).

Following a hearing on the motion before the Honorable Thomas King Kistler, at which the above-referenced testimony was presented, the court denied suppression. The suppression court found that Valdivia had voluntarily given his consent to search and that it was not the product of police coercion. The suppression court further found that the use of a canine sniff was within the scope of his consent because Valdivia "never indicated he was limiting his search so as not to include a consent for a K-9 Unit, nor did he make any attempt to revoke consent when he saw the K-9 Unit arrive." Suppression Court Opinion, 9/9/2014, at 9. Because Valdivia was engaged in the transport of illegal drugs, the suppression court found that he should have been aware that a canine sniff was within "the realm of possibilities." *Id.*[6]

Judge Kistler held a stipulated bench trial on October 27, 2014, at which the parties agreed to the submission of the criminal complaint, the lab report confirming the substance recovered to be marijuana and recording the weight thereof, and the transcripts of the preliminary hearing and the suppression hearing. The court convicted Valdivia of the crimes charged and on January 23, 2015 sentenced him to 11½ to 23 months of incarceration followed by 30 days of probation.

---

[6] Valdivia also requested a finding that the mandatory minimum sentencing statute, 18 Pa.C.S. § 7508, was unconstitutional pursuant to *Alleyne v. United States*, 570 U.S. 99 (2013) (holding that any fact that increases a mandatory minimum sentence is an element of an offense that must be found by the factfinder beyond a reasonable doubt). The suppression court granted this aspect of Valdivia's motion. The Commonwealth challenged this conclusion in a post-sentence motion, which the trial court denied. It then appealed the decision to the Superior Court, but subsequently withdrew and discontinued its appeal following this Court decision in *Commonwealth v. Hopkins*, 117 A.3d 247 (Pa. 2015) (finding a substantially similarly worded sentencing statute unconstitutional in its entirety in light of *Alleyne*).

Valdivia timely appealed to the Superior Court, challenging, in relevant part, the finding by the suppression court that his consent was voluntarily given, contending that the investigative detention that occurred following the completion of the purpose of the original traffic stop was unlawful and that the circumstances surrounding his detention were coercive. He further asserted that even if valid, the canine sniff was not within the scope of his consent because a reasonable person would not have understood that he was consenting to a search by a dog and that the lengthy delay before the search was conducted vitiated his consent.

In a published opinion authored by the Honorable Patricia H. Jenkins, the Superior Court affirmed. *See Commonwealth v. Valdivia*, 145 A.3d 1156 (Pa. Super. 2016). Addressing the voluntariness of Valdivia's consent, the intermediate appellate court found "a mixture of coercive and non-coercive factors at the time of Trooper Hoy's request."[7] *Id.* at 1166. Although finding the question to be "close," the Superior Court held that "the non-coercive elements outweigh[ed] the coercive elements" and that Valdivia's consent was voluntarily given. *Id.*

---

[7] The coercive factors included: "(1) Trooper Hoy never told Valdivia he was free to leave …, (2) Trooper Hoy ordered Valdivia to exit his car to receive the traffic warning …, (3) there was more than one trooper at the scene of the stop …, and (4) Trooper Hoy never verbally advised Valdivia that he was free to refuse consent[.]" *Valdivia*, 145 A.3d at 1166. The non-coercive factors found by the Superior Court included: "(1) Trooper Hoy gave back Valdivia's documentation, (2) there is no evidence of police abuses, aggressive tactics, coercive language, coercive tone of voice, physical contact, or the use of physical restraints at any time during the detention …, and (3) Valdivia read and signed a consent form which advised that he did not have to consent." *Id.* The Superior Court found that prior precedent treated this last factor (his knowledge of the right to refuse consent) "as a strong sign of voluntariness." *Id.* (citing *Commonwealth v. Reid*, 811 A.2d 530 (Pa. 2002); *Commonwealth v. Bell*, 871 A.2d 267 (Pa. Super. 2005) (en banc)).

Regarding the scope of Valdivia's consent, the Superior Court concluded that a reasonable person would have understood that his consent included a dog sniff. *Id.* "Nothing about a canine sniff strikes us as more intrusive than a vehicle search by humans, so when an individual consents to an official search of his vehicle, it is natural to assume that his consent includes both human and canine searches." *Id.* According to the Superior Court, "The most logical way – and perhaps the only way – for a defendant to place canine sniffs beyond the scope of consent is to tell the officer that canine searches are off limits." *Id.* Because Valdivia never proactively informed the troopers that he did not consent to the use of a dog to conduct the search, the intermediate appellate court found that the canine sniff was within the scope of his consent. *Id.* at 1166-67.

Valdivia filed a petition for allowance of appeal to this Court, which we granted to review the following question:

> Whether, in a case of first impression, the Superior Court erred in holding that a reasonable person would have understood that their consent to a roadside search of their vehicle would encompass a canine sniff of all of the packages contained inside the vehicle, and that said consent was knowing, intelligent, and voluntary where the police officers withheld pertinent information about the forthcoming search from [Valdivia], including that the canine search would not start any sooner than an hour from when [Valdivia]'s consent was given?

*Commonwealth v. Valdivia*, 165 A.3d 869 (Pa. 2017) (per curiam).

Appellate review of a suppression decision is limited to the suppression record, considering the evidence presented by the Commonwealth as the prevailing party and any uncontradicted evidence presented by the defense. *Commonwealth v. Johnson*, 160 A.3d 127, 138, 139 n.12 (Pa. 2017), *cert. denied sub nom. Johnson v.*

*Pennsylvania*, 138 S. Ct. 508 (2017). This Court is bound by the facts as found by the suppression court so long as they are supported by the record, but our review of its legal conclusions is de novo. *Id.* at 138.

Both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals, their homes, their papers, and their effects and possessions from "unreasonable searches and seizures." U.S. Const. amend. IV; Pa. Const. art. I, § 8. For a search to be lawful, police must first obtain a warrant, supported by probable cause, from a neutral and detached magistrate. *Commonwealth v. Loughnane*, 173 A.3d 733, 741 (Pa. 2017); *Johnson*, 160 A.3d at 140. "A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies." *Commonwealth v. Strickler*, 757 A.2d 884, 888 (Pa. 2000).

One of the limited exceptions to the warrant requirement is a consensual search. *Id.* "[W]e have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991). Although a warrantless, but consensual, search is constitutionally permissible, obtaining consent is an "investigative tool" utilized by law enforcement. *Strickler*, 757 A.2d at 892. It allows police to do what otherwise would be impermissible without a warrant. *See Commonwealth v. Cleckley*, 738 A.2d 427, 429 (Pa. 1999). As a consent search is in derogation of the Fourth Amendment, there are carefully demarked limitations as to what constitutes a valid consent search.

First, consent must be voluntarily given during a lawful police interaction.[8]  For a finding of voluntariness, the Commonwealth must establish that the consent given by the defendant "is the product of an essentially free and unconstrained choice – not the result of duress or coercion, express or implied, or a will overborne – under the totality of the circumstances."  *Commonwealth v. Smith*, 77 A.3d 562, 573 (Pa. 2013) (citing *Strickler*, 757 A.2d at 901); *see also Schneckloth v. Bustamonte*, 412 U.S. 219, 248 (1973).

If consent is given voluntarily, the ensuing search must be conducted within the scope of that consent.  The standard for measuring the scope of an individual's consent is one of "objective reasonableness."  *Jimeno*, 500 U.S. at 251; *Commonwealth v. Reid*, 811 A.2d 530, 549 (Pa. 2002).[9]  We do not ascertain the scope of consent from the individual's subjective belief or the officer's understanding based on his or her training

---

[8]  In the courts below, Valdivia challenged the legality of the detention that occurred following the completion of the purpose of the traffic stop, asserting that police lacked reasonable suspicion to continue to detain him.  Valdivia did not seek allowance of appeal of this question before this Court, so we do not discuss it further.  For purposes of the appeal before us, we presume that any consent to search was given by Valdivia during a lawful investigatory detention.

[9]  *Reid* was decided under the Fourth Amendment to the United States Constitution.  *See Reid*, 811 A.2d at 549.  It is well settled that the Pennsylvania Constitution can (and in many instances does) provide greater protection of individual rights than its federal counterpart.  *See, e.g., Commonwealth v. Brown*, 996 A.2d 473, 476 (Pa. 2010) ("Article I, § 8 of the Pennsylvania Constitution, though similarly phrased, generally provides greater protection than that provided by the Fourth Amendment, because the core of its exclusionary rule is grounded in the protection of privacy while the federal exclusionary rule is grounded in deterring police misconduct.").  Valdivia, however, makes no argument that the Pennsylvania Constitution provides greater protection to its citizens than does the United States Constitution when measuring the scope of consent.  In fact, in his brief before this Court, he relies upon *Jimeno* and *Reid* as setting forth the test for determining the scope of consent.  Therefore, for purposes of this appeal, we review this case on the premise that the test is the same under Pennsylvania and federal law.

and experience, but based on "what … the typical reasonable person would have understood by the exchange between the officer and the suspect." *Jimeno*, 500 U.S. at 251; *Reid*, 811 A.2d at 549.

## I. **Voluntariness of Consent**

Valdivia asserts that the consent he gave to the troopers to search his vehicle was involuntary because it was the result of police "misrepresentation" and "stealth" – a veritable "bait and switch." Valdivia's Brief at 17, 20. He contends that his consent was premised upon his reasonable belief that two human officers would immediately conduct a hand search of his car, but that police intentionally deceived him when Trooper Hoy "secretly contacted the canine handler" to conduct the search of Valdivia's vehicle. *Id.* at 17, 22-23. According to Valdivia, police then "purposely enlarged the time needed for the traffic stop by ordering [] Valdivia to exit his vehicle for the ostensible purpose of explaining the written warning," so as to give the K-9 unit time to arrive at the scene. *Id.* at 22. This conduct, he asserts, "rise[s] to the level of implied coercion," in that his consent was obtained "through stealth, deceit and misrepresentation when [the troopers] purposely withheld basic information about the search they intended to conduct … which rendered his consent involuntary under the totality of the circumstances." *Id.* at 24.

We find it unnecessary to conduct a studied application of the law as it relates to the facts as alleged by Valdivia because our review of the record finds no support for the overt and intentional misrepresentation by police that Valdivia claims occurred. Although the troopers failed to communicate information at the time Valdivia gave his consent (which, as discussed infra, directly impacts the scope of Valdivia's consent),

there was no evidence that the troopers acted stealthily, secretly or deceitfully, and the suppression court did not so find. There is also nothing in the record to suggest that Trooper Hoy removed Valdivia from his vehicle to prolong the initial traffic stop to give the K-9 unit time to arrive. Trooper Hoy testified that it is his "standard practice" to remove individuals from their cars during traffic stops and that he does this for every traffic violation. N.T., 8/8/2014, at 48. Valdivia did not present any evidence to contradict this testimony.

Based on the standard by which we review suppression claims, we do not find any support for Valdivia's assertions of stealth, deceit and misrepresentation by police to obtain his consent. As this is the sole basis for Valdivia's assertion that his consent was not voluntarily given, we find this claim to be meritless.

## II. Scope of Consent

Even if his consent was valid, Valdivia asserts that the search conducted exceeded the scope of his consent.[10] He argues that under the circumstances, a reasonable person would not have considered the consent given by Valdivia to encompass a delayed search by a drug sniffing dog. *Id.* at 25-29. Valdivia states that under the circumstances present at the time he gave consent, a reasonable person would have envisioned only that the troopers would have "conducted a brief hand-

---

[10] Defender Association of Philadelphia and Pennsylvania Association of Criminal Defense Lawyers filed an amicus brief in support of Valdivia's argument that the search conducted exceeded the scope of his consent. Amici also assert that the removal of the boxes from the vehicle for the canine to conduct the search thereof constituted a seizure that required probable cause. Amici Brief at 25-28. This issue was neither raised nor briefed by Valdivia, and thus is not properly before this Court in this appeal. *See Commonwealth v. Cotto*, 753 A.2d 217, 224 n.6 (Pa. 2000) ("An amicus curiae is not a party and cannot raise issues that have not been preserved by the parties."); Pa.R.A.P. 513, Note.

search of [his] vehicle immediately after obtaining his consent." *Id.* at 27. Valdivia reasons that Pennsylvania law treats a canine sniff as separate and different from a search conducted by a human. *Id.* at 30 (citing *Commonwealth v. Johnston*, 530 A.2d 74 (Pa. 1987); *Commonwealth v. Rogers*, 849 A.2d 1185, (Pa. 2004); *Commonwealth v. Martin*, 626 A.2d 556 (Pa. 1993)).

Further, Valdivia insists that a reasonable person would anticipate that the search to which he consented would be conducted immediately. Valdivia's Brief at 31 (citing *Reid*, 811 A.2d at 556 (Saylor, J., concurring)). Valdivia contends that the troopers failed to inform him of the protraction of the stop and did not "do anything to advance the search" in the forty minutes it took for Trooper Tiracorda and Tom to arrive. *Id.* at 33. Under the totality of the circumstances, Valdivia states, the lengthy delay expanded the search beyond the scope of what a reasonable person would have understood when agreeing to allow the troopers to search his vehicle. *Id.* at 33-34.

Valdivia states that his failure to revoke his consent is not dispositive, particularly in light of the "numerous coercive elements present throughout the entire duration of the initial traffic stop and subsequent detention[.]" *Id.* at 34. He contends that his failure to object cannot be the basis for allowing the expansion of the scope of the search that occurred in this case, where he had no basis upon which to object until after police had already expanded the scope of the search. *Id.* at 34. According to Valdivia, the "reasonable person standard" is at odds with the Superior Court's conclusion that the burden was on Valdivia to object or limit the scope of the search. *Id.* at 35. In his view, placing the burden on the citizen to object to a search that exceeds the scope of the consent given "would effectively eliminate the 'reasonable person' standard" because it

would not matter what a person would have understood the search to include under the circumstances. *Id.* An individual would have to object to limit a more expansive search than initially contemplated, e.g., "opening locked containers, destroying parts of a car, or summoning a trained dog to the scene[.]" *Id.*

The Commonwealth responds first by contending that Valdivia knew that a canine was going to be used to conduct the search and that there would be some delay because Trooper Hoy testified that it was his "standard practice … to so inform a consenting suspect." Commonwealth's Brief at 8. The Commonwealth asserts that the suppression court failed to make a finding of fact on this question, and thus, pursuant to our standard of review, we must accept that Trooper Hoy followed this practice in the case at bar because it was presented as evidence by the prevailing party. *Id.* at 8-9.

Further, the Commonwealth argues that because a dog sniff is unquestionably a "search," it was necessarily encompassed by Valdivia's consent to a search of his vehicle. *Id.* at 10-11. Similar to the analysis conducted by the Superior Court, the Commonwealth states that because Valdivia did not restrict the type of search that could be conducted, protest when he saw the K-9 unit arrive, or revoke his consent at any time, the use of the dog to conduct the search was within the scope of his consent – a conclusion, it states, that aligns with this Court's decision in *Reid. Id.* at 13.

The Commonwealth also asserts that the delay of forty minutes was objectively reasonable under the circumstances because the K-9 unit was off duty and had to travel to the scene of the search. *Id.* at 15-16. It notes that in *Reid*, a majority of this Court found that a search of the defendant's vehicle conducted three days after he gave consent was valid. *Id.* at 15. The Commonwealth further speculates that the use of a

canine to conduct the search here was likely comparable to the duration of a human search, as a human search would have required a more intrusive examination of the vehicle. *Id.* at 17.

We begin by addressing the Commonwealth's contention that we must find that Trooper Hoy informed Valdivia that a K-9 unit was coming to the scene. The Commonwealth is correct that evidence of a person's habit or routine practice is **admissible** as evidence that he or she acted in conformance therewith on the occasion in question. Pa.R.E. 406. The evidence presented by the Commonwealth on this point, however, was internally contradictory – Trooper Hoy testified at the suppression hearing that he informed Valdivia after obtaining his consent that he was going to call a K-9 unit to the scene, but after being confronted with his preliminary hearing testimony, at which he testified that he did not so inform Valdivia, he changed his testimony, stating instead that he did not know whether he told Valdivia that he had called for a canine to conduct the search. N.T., 8/8/2014, at 54-56; *see also* N.T., 12/18/2013, at 24. Trooper Hoy could say only that it was his "standard practice … to, you know, keep the individual informed of what's happening on a traffic stop." N.T., 8/8/2014, at 55-56. He did not specifically testify that it was his habit or practice to inform individuals that a canine, instead of a person, would be conducting a vehicle search, or that the vehicle search would be delayed for the better part of an hour.

Moreover, in its written opinion, the suppression court's discussion of the claimed illegality of the canine sniff is consistent with a finding that Trooper Hoy did not inform Valdivia that he had called for a dog to conduct the search. The suppression court based its decision to deny suppression on Valdivia's failure to limit the search to

exclude a dog sniff and his failure to revoke his consent when the K-9 unit arrived at the scene.  Suppression Court Opinion, 9/9/2014, at 9.  The court did not discuss the possibility that the canine search was within the scope of Valdivia's consent based on his actual knowledge that a dog was coming to conduct the search.  Thus, although the suppression court did not enter a specific factual finding on this point, its discussion of this issue reflects its conclusion that Trooper Hoy did not inform Valdivia that he had called for a dog to conduct the search of his vehicle.

As stated above, we are bound by the factual findings made by the suppression court that are supported by the record.  *Johnson*, 160 A.3d at 138.  Because the record supports a finding that Trooper Hoy did not inform Valdivia that he had called a K-9 unit to conduct the search, and it was on this factual premise that the suppression court decided the issue, we conclude that we are bound to proceed on the basis that Valdivia was not informed that a K-9 unit had been called to conduct a search.

We now turn to the question of whether Valdivia, without actual knowledge that Trooper Hoy called a K-9 unit to the scene, gave consent to Troopers Hoy and Long to a search of his vehicle that extended to a dog sniff search.[11]  As we have discussed, a determination of the scope of consent given for police to conduct a search requires consideration of what a reasonable person in the position of the defendant would have believed he or she was allowing, based on the exchange that occurred between police

---

[11] The Commonwealth does not claim, nor does the record support a finding, that the troopers had probable cause to suspect that the vehicle contained drugs.  As such, there is no cause for discussion of the automobile exception to the warrant requirement as an alternative basis to support the search.  *See Commonwealth v. Gary*, 91 A.3d 102 (Pa. 2014) (adopting the federal automobile exception, which permits police to conduct a warrantless search of a vehicle if police have probable cause to believe the vehicle contains evidence of criminal activity).

and the individual. The scope of a search, in turn, "is limited by the terms of its authorization." *Reid*, 811 A.2d at 548-49 (citing *Walter v. United States*, 447 U.S. 649, 656 (1980)). "To be justified by consent, the scope of the search actually made should be no broader than the scope of consent given." Scope, Warrantless Search Law Deskbook § 16:6 (2017).

When it comes to the use by law enforcement of a trained narcotics dog to conduct a search, Pennsylvania law differs considerably from federal law. In *United States v. Place*, 462 U.S. 696 (1983), the United States Supreme Court held that a canine sniff of an item to which the police have a lawful right of access is not considered a search under the Fourth Amendment to the United States Constitution. *Id.* at 707. *See also Illinois v. Caballes*, 543 U.S. 405 (2005) ("the use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view,'—during a lawful traffic stop, generally does not implicate legitimate privacy interests") (internal citation to *Place* omitted).

This Court rejected the federal approach to dog sniffs in *Commonwealth v. Johnston*, which involved a warrantless canine search of the exterior of a storage locker. Although finding that a search conducted by a canine was generally less intrusive than a human search, we concluded that "a free society will not remain free if police may use this, or any other crime detection device, at random and without reason." *Johnson*, 530 A.2d at 79. We thus adopted a "middle ground applicable to the investigations conducted by police handlers of narcotics detection dogs," permitting the use by police of a canine to conduct a search if "the police are able to articulate reasonable grounds for believing that drugs may be present in the place they seek to

test," and that "police are lawfully present in the place where the canine sniff is conducted." *Id.*

In addition to holding that a search by a trained narcotics dog is itself a search, the Court in *Johnston* recognized that such a search is distinct from a search conducted by a human officer. *See id.* (differentiating a police search from a search involving the use of a dog). We again recognized this difference in *Commonwealth v. Rogers*, a case questioning the constitutionality of a warrantless, nonconsensual dog sniff of a vehicle. Of relevance to the case at bar, we observed that while "canine sniffs are searches …. **they are not akin to searches conducted by human law enforcement officers**," and generally require a lesser degree of suspicion. *Rogers*, 849 A.2d at 1192 (emphasis added). *But see, cf. Martin*, 626 A.2d at 560 (holding that the use of a drug detection dog to sniff a person requires that police both be "lawfully in place at the time of the search [and] have probable cause to believe that a canine search of a person will produce contraband or evidence of a crime").

We disagree with the Superior Court (and the concurring and dissenting Justices) that the level of intrusion involved with a canine sniff, as compared to a human search, has any relevance to the question before us. *See Valdivia*, 145 A.3d at 1166; Concurring and Dissenting Op. (Todd, J.) at 7-8; Concurring and Dissenting Op. (Mundy, J.) at 3. Instead, we must decide whether a reasonable person under the circumstances would have understood Valdivia's general consent given to two human officers to include a search conducted by a later produced narcotics detection dog. As our discussion of the precedent above makes clear, these are two categorically different searches. A dog sniff constitutes a separate and distinct mechanism for drug detection

than a search conducted by a human officer. Less intrusive or not, a dog search is not a search by a human officer.[12]

Here, Valdivia gave his consent for two human officers to conduct a search of his vehicle. As Trooper Hoy testified at the suppression hearing, after asking Valdivia questions about his travel plans, he simply "asked for consent to search the vehicle," and that "Valdivia agreed to allow **us** to search the vehicle." N.T., 8/8/2014, at 17 (emphasis added). There was no canine officer or handler present at the time, nor did the circumstances surrounding the interaction between Valdivia and the troopers suggest that a canine unit was going to be used to conduct the search. Under these circumstances, we cannot conclude that a reasonable person in Valdivia's position would have understood that his consent to allow two human officers to search his vehicle would somehow operate to permit the search to be conducted by a canine trained in drug detection.[13]

Further, based on the facts of the case and the exchange between Valdivia and the troopers, the length of time that passed between Valdivia's consent to search and the occurrence of the search was beyond that which a reasonable person would have expected and understood. There was no evidence presented at the suppression

---

[12] The case law relied upon by Justice Todd is irrelevant to the circumstances before us. *See* Concurring and Dissenting Op. (Todd, J.) at 8 n.4. Regardless of whether a search by a dog is less intrusive, the point here is, as noted, that a search by a dog is not a search by a person.

[13] Contrary to the reasoning advanced by the suppression court, that Valdivia was in fact transporting drugs does not mean he should have presumed that police were aware of this fact, let alone that a dog would be called to the scene to conduct the search. *See* Suppression Court Opinion, 9/9/2014, at 9. The test to be applied is that of a reasonable person, an objective standard. *See Jimeno*, 500 U.S. at 251; *Reid*, 811 A.2d at 549.

hearing to explain why the troopers could not have conducted an immediate search of Valdivia's vehicle.

While the Commonwealth is correct that we found a search in *Commonwealth v. Reid*, conducted three days after police obtained Reid's consent, to be within the scope of his consent, this case is readily distinguishable from *Reid*. *Reid* involved a double homicide that occurred at the victims' home. The victims were Reid's estranged wife and her teenaged daughter. While police were conducting an investigation of the crime scene, Reid came to the house and voluntarily agreed to accompany police to the barracks to speak with them. *Reid*, 811 A.2d at 542. He provided an alibi for the prior evening, said he had not been near the victims' home and denied that he owned a gun. Aware that police were looking for evidence connecting him to the murders, Reid then voluntarily consented to an analysis of his jacket, boots and hat as well as a search of his truck and motel room. *Id.* at 542-53. After giving his consent, he accompanied the troopers to his truck, and they conducted a roadside search. Several items were seized from the truck, including a pair of brown gloves, a knife and a machete, none of which were introduced at Reid's trial.

Thereafter, Reid was arrested for violating a protection from abuse order based on contacts he had with his estranged wife and his truck was impounded in a police storage facility. Three days later, and without first obtaining a warrant, police conducted another search of his truck and seized a pair of gloves with a pattern similar to, but not the same as, an impression that was found on a PVC pipe outside of the victims' home. *Id.* at 549.

Reid was charged with the murders two months later. Prior to trial he challenged, inter alia, the second search of his truck as being beyond the scope of his consent. The trial court denied his motion, and he was convicted of the murders and related charges. Following the imposition of the death penalty, he appealed to this Court. A majority of the *Reid* Court held that the second search was within the scope of his consent. *Id.* The Court found that Reid "did not at any point revoke his consent to allow the police to search his truck" and the search was conducted "within a relatively short time span after [he] provided his consent." *Id.* Alternatively, the Court found that any error admitting the evidence recovered from the truck was harmless. *Id.* at 549 n.37.

Unlike in *Reid*, the delayed vehicle search in the case at bar was an initial search that occurred during a traffic stop while the van was still in Valdivia's possession and under his control. Police had not seized his vehicle, nor did they have probable cause to do so. *See Commonwealth v. Gary*, 91 A.3d 102, 138 (Pa. 2014) (holding that the warrantless seizure of a vehicle requires that the police have probable cause); *see supra*, note 11. The continued detention of Valdivia and his vehicle was solely the result of Valdivia's consent to search his van. Police stopped Valdivia mid-travel, between exits on an interstate highway on a cold December night. Under these circumstances, we agree with the position espoused by Chief Justice Saylor in his *Reid* concurrence: a "typical reasonable person" would have expected that his consent to search his vehicle was given for an immediate search. *Reid*, 811 A.2d at 556 (Saylor, J., concurring) (citing LaFave, *A Treatise on the Fourth Amendment* § 8.1(c)).

Nor does *Reid* require a finding that the failure to revoke consent "indicate[s that] the search actually performed was within the scope of consent," as the Commonwealth contends. *See* Commonwealth's Brief at 10. As stated above, *Reid* is inapposite to the case at bar, as it involved a second search of a vehicle that was in police custody during an ongoing murder investigation in which Reid knew he was a suspect. Indeed, in *Reid*, police promptly conducted the first search of Reid's vehicle in his presence following the grant of consent. *See Reid*, 811 A.2d at 549.

The case at bar, on the other hand, involves an initial search during a traffic stop with Valdivia present. Valdivia gave his consent to search the vehicle to the two police officers who conducted the traffic stop. Based on the facts present in this case, Valdivia's failure to object to the delayed search by the canine officer or to revoke his consent has no bearing on the outcome of this case. While an individual may place limits on the scope of any consent given, or revoke consent altogether, the failure to do so does not modify the consent to the search that was given, nor does it give police carte blanche to conduct a search of limitless scope and duration.

The scope of a search is controlled by the scope of consent given, which, in turn, is determined pursuant to a reasonable person standard under the circumstances at the time the exchange between the officer and the suspect occurs. The burden is on law enforcement officials to conduct a search within those parameters. An individual is not required to police the police; absent another exception to the warrant requirement, when a search exceeds the scope of an individual's given consent, the search is illegal regardless of whether the individual objected or revoked his or her consent. *See generally* 68 Am. Jur. 2d *Searches and Seizures* § 271 ("A general consent to a search

on its own does not give an officer unfettered search authority. Even when an individual gives a general consent without express limitations, the scope of a permissible search has limits: it is constrained by the bounds of reasonableness and what the reasonable person would expect.") (footnotes collecting cases omitted).

In her concurring and dissenting opinion, Justice Todd cites *Jimeno* and *Reid* in support of the proposition that a determination of the scope of a person's consent requires consideration of "the totality of all of the circumstances." *See* Concurring and Dissenting Op. (Todd, J.) at 4. Nowhere in either *Jimeno* or *Reid*, however, is "totality of the circumstances" language used. Instead, as stated throughout this Opinion, the scope of consent is based on what a reasonable person would have understood by the exchange that occurred between the officer and the suspect. *See Jimeno*, 500 U.S. at 250-51; *Reid*, 811 A.2d at 549. While there certainly could be more than one "exchange" that occurs between an officer and an individual during a single encounter, case law does not support a finding that an officer's unilateral decision to conduct a wholly different type of search than a reasonable person would have understood his consent to allow is nonetheless within the scope of the given consent simply because the suspect failed to object. Justice Todd's claim is unfounded that we are somehow reformulating the law by limiting the scope of the search to what was reasonably understood at the time consent was given. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 19 (1968) ("The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible.").

Justice Todd further cites to federal circuit court cases where the suspect's failure to object was considered by the court in determining whether the area searched

was within the scope of consent, an issue that we are not addressing in this case.[14] *See* Concurring and Dissenting Op. (Todd, J.) at 11-13. They do not stand for the proposition that would be required here, i.e., that the failure to object brings an otherwise uncontemplated type of search within the scope of consent. In fact, in all of the circuit court cases relied upon in her concurring and dissenting opinion, the search was conducted in the manner consented to by the suspect. As stated, the question in those cases dealt with whether the area searched was within the scope of consent, not whether the type of search that occurred was, in fact, consented to.[15] Thus, these cases do not support a finding that Valdivia's failure to object under the circumstances of this case rendered the canine search conducted within the scope of his consent.

Under the circumstances of this nighttime roadside vehicle stop when Valdivia's consent was sought and received, a reasonable person would have expected the two police officers at the scene to conduct an immediate hand search of the vehicle. Conversely, our objective review of the exchange between Valdivia and Trooper Hoy,

---

[14] Valdivia consented to the search of his vehicle. The contraband, however, was discovered in wrapped packages that were removed from the vehicle to conduct the canine search. Valdivia did not provide targeted advocacy in his brief before this Court concerning the propriety of the search of the closed containers found within his vehicle, and instead presented his arguments regarding the search of the packages only within his claims that the scope of his consent did not extend to a delayed search by a canine. Given our agreement with Valdivia that a search by a dog was not encompassed within the scope of his consent, we do not reach the narrower question of whether a general consent to search a vehicle encompasses a search of closed containers within the vehicle.

[15] Justice Todd also cites in her concurring and dissenting opinion to *Commonwealth v. Smith*, 77 A.3d 562 (Pa. 2013). This case, however, has nothing to do with the suspect's failure to object. Instead, it questioned whether a reasonable person would have understood that consenting to a blood draw and testing (which Smith unquestionably did) following a motor vehicle accident meant "the potentiality of the results being used for criminal, investigative, or prosecutorial purposes." *Id.* at 573.

as well as the surrounding circumstances, leads us to conclude that a reasonable person in Valdivia's position would not have understood his consent to encompass a search conducted by a drug sniffing dog that would occur forty minutes after he gave his consent. Valdivia gave a general consent to two human police officers to search his car. The search that occurred exceeded the scope of that consent. Therefore, the evidence obtained as a result of the search should have been suppressed. On this basis, we reverse the decision of the Superior Court and remand the case for further proceedings consistent with this Opinion.

Chief Justice Saylor and Justices Dougherty and Wecht join the opinion.

Justice Todd files a concurring and dissenting opinion in which Justice Baer joins.

Justice Mundy files a concurring and dissenting opinion in which Justice Baer joins.