J-A17037-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
        Appellee : 
:
      v. :
:
ANTHONY L. FELDER :
:
        Appellant : No. 2430 EDA 2021

Appeal from the Judgment of Sentence Entered October 20, 2021
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0002334-2020


COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
        Appellee : 
:
      v. :
:
ANTHONY L. FELDER :
:
        Appellant : No. 2431 EDA 2021

Appeal from the Judgment of Sentence Entered October 20, 2021
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0005807-2020


BEFORE: KING, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.: **FILED DECEMBER 21, 2023**

Anthony L. Felder (Felder) appeals from the judgment of sentence entered in the Court of Common Pleas of Bucks County (trial court) following his bench trial convictions for two counts each of persons not to possess

---

[*] Retired Senior Judge assigned to the Superior Court.

firearms and carrying firearms without a license, and one count of possession of a controlled substance.[1]  We affirm in part and reverse in part.

**I.**

**A.**

The trial court opinion set forth the relevant facts of this appeal as follows:

> Officer Harley is a patrol officer for the Bensalem Township Police Department and has been so employed for approximately two years.  Prior to his employment with the Bensalem Township Police Department, Officer Harley served as a SEPTA Transit Police Officer in Philadelphia for approximately three years.  Officer Harley also testified to his personal experience and knowledge of firearms as, not only a seasoned police officer, but also as an avid collector.  Officer Harley testified that he has owned revolver-type firearms in the past and explained that "Generally, a revolver, usually metal.  Usually has a curved handle, solid curved handle, has a cylinder in the middle that holds the ammo.  It has the hammer on the back that you can use to, you know, cock the gun."
>
> On May 1, 2020, at approximately 10:31 p.m., Officer Harley responded to an "abandoned 911 call" reported from the Knights Inn motel room number 163 located at 2707 Lincoln Highway in Bensalem Township.  Officer Harley testified that by "abandoned 911 call" what is meant is that someone from room 163 called the police 911 line and then hung up.
>
>        \*     \*     \*
>
> Officer Harley arrived on scene at approximately 10:44 p.m.  Officer Harley parked his Bensalem Township patrol wagon in the parking lot of the Knights Inn near rooms 162 and 163.  When Officer Harley first arrived on scene, he stayed in his patrol wagon

---

[1] 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), and 35 P.S. § 780-113(a)(16), respectively.

in order to assess the area as Officer Harley did not know what to expect given that he was responding to an "abandoned 911 call."

\* \* \*

Officer Harley testified that he sat in the patrol wagon for approximately forty seconds and observed an individual, later identified as Melvin Dixon, standing outside of room 163, the room from which the abandoned 911 call came. Officer Harley testified that he observed Mr. Dixon coming in and out of room 163 at this time. Officer Harley also observed Mr. Dixon making gestures towards a vehicle—an orange Ford Mustang—parked directly in front of rooms 162 and 163, as if an individual were inside the vehicle. Officer Harley observed the gestures of Mr. Dixon and explained that it appeared as if he was communicating with an individual inside the Mustang regarding Officer Harley's presence on scene. Officer Harley testified that he believed these individuals were attempting to communicate about him because Mr. Dixon would be "looking in the car at the subject sitting in the car, and then he would look at me and kind of shrug his shoulders, and then kind of look back at the guy in the car, and then kind of look over at me."

At this time, Officer Harley exited his vehicle and approached Mr. Dixon in front of room 163. As Officer Harley was walking, he noticed the individual inside the Mustang making furtive movements as if he was putting or grabbing something from the driver's door compartment. Officer Harley shined his flashlight into the vehicle through the passenger side window and observed Felder … hunched over in the driver seat reaching down into the driver's door compartment area. Officer Harley then asked Felder 'what he was doing' at which point Felder abruptly exited the vehicle, startling Officer Harley, and pointed to room 162 saying that was his room. Officer Harley testified … that Officer Harley did not ask Felder to exit the Mustang. Officer Harley then told [Felder]it looked like he was tucking something in the driver side door, which [Felder] denied and then told Officer Harley 'you can search everything.' Officer Harley then came around the back of the Mustang and asked Felder if he had any weapons on him, at which point [Felder] put up his hands and said "no."

\* \* \*

Officer Harley then informed Felder that he was going to pat him

down for officer safety.

\* \* \*

From the pat down, which Officer Harley described as running his open palms over the silhouette of [Felder's] body, Officer Harley discovered a revolver on the left hip of [Felder], which Officer Harley confiscated. Specifically, Officer Harley explained that he immediately recognized the revolver from the plain feel on [Felder's] left hip because he "felt a curved shape solid object that was consistent with a handle of a revolver that was tight to his waist just above his belt line, just above his belt." Officer Harley checked the revolver and found that it contained no bullets. Officer Harley then handcuffed [Felder] and called for backup.

\* \* \*

Officer Harley further testified that he was the only officer on scene at this point and that he was outnumbered by Felder and Mr. Dixon. Officer Harley is approximately 5' 7" and weighs approximately 165 pounds, whereas both Felder and Mr. Dixon are larger individuals, with [Felder]—in particular—being significantly larger than Officer Harley, as [Felder] is over 6 feet tall and weighs over 200 pounds. Officer Harley also testified while he was taking Felder into custody, Mr. Dixon also presented safety concerns in that he attempted to go back into Room 163 and Officer Harley told him to stop, because he did not want a potential suspect to leave his line of sight, especially by entering the very room Officer Harley was there to investigate.

Once Officer Harley had placed Felder in handcuffs, he asked Felder if he had a license to carry the revolver, to which Felder initially responded yes. However, Officer Harley then asked [Felder]if he had a criminal record, to which Felder said yes. At this point, Officer Harley asked Felder how he could have a license to carry a firearm if he had a criminal record. Felder said that he had his record expunged, to which Officer Harley explained to [Felder]that he was going to run a search to essentially discover whether or not [Felder] was telling him the truth. [Felder] finally responded that he did not have a license to carry the revolver.

- 4 -

(Trial Court Opinion, filed 5/2/22, at 6-11) (record citations omitted).[2]

After Officer Harley placed Felder in the back of his patrol car, the back-up officers who arrived at the scene decided to have the Mustang towed. The trial court explained the circumstances surrounding the tow as follows:

Officer [Michael] Owen further testified that the officers believed they had the authority to conduct an inventory search of the vehicle, before towing the vehicle away, because (1) the registration on the Mustang did not match the license plate and revealed that the license plate belonged to a Lexis owned by a different individual (2) a search of [Felder's] license revealed that his license was suspended and expired (3) the VIN number of the Mustang was designated as "open" which means the vehicle was not registered (4) the inspection stickers on the vehicle were invalid or expired and as such it would not be legal for this vehicle

---

[2] The record on appeal includes the DVD containing Officer Harley's body camera footage from his interaction with Felder. This Court reviewed the footage, which confirmed the suppression court's findings of fact. Specifically, the footage revealed that Officer Harley exited his patrol car and walked toward the passenger side of the Mustang while putting on rubber gloves. (**See** Commonwealth's Exhibit CS-4 at 0:28-0:44). At that point, Mr. Dixon was not standing outside. After putting on the gloves, Officer Harley illuminated his flashlight and pointed it at the Mustang's passenger-side window. (**Id.** at 0:45). Felder was inside the Mustang, seated in the driver's seat. (**Id.** at 0:45-0:46). While Felder was making the furtive movements, Mr. Dixon exited from the motel room. (**Id.** at 0:46). Officer Harley spoke first and asked, "What's going on?" (**Id.** at 0:48-0:49). Simultaneously, Felder exited the vehicle. Felder responded, "We're alright." (**Id.** at 0:50-0:52). Felder made a pointing gesture and told the officer, "This is my apartment right here." (**Id.** at 0:55-0:57). Officer Harley then asked, "What did you just tuck in the door when I walked up here?" (**Id.** at 1:01-1:03). Felder replied, "Nothing. You can search everything, bro. I didn't touch nothing." (**Id.** at 1:03-1:06). The officer asked whether Felder and Mr. Dixon were "together," and he rounded the Mustang to approach Felder, who stood next to the front door on the driver's side. (**Id.** at 1:08-1:12). Officer Harley asked Felder whether he was carrying any contraband. (**Id.** at 1:12-1:14). Felder immediately put his hands in the air, and Officer Harley commenced the pat down. (**Id.** at 1:14-1:22).

to be on the roadway (5) there were no individuals on scene that could rightfully take control of the vehicle as Mr. Dixon had an outstanding warrant and was intoxicated at the time and (6) that the Knights Inn is known to Bensalem Police as a high crime area where auto-theft and vehicle damage occurs frequently.[3]

Officer Owen then testified to conducting the inventory search of the Mustang before towing the vehicle after receiving instructions from his superior officer, Sergeant McGinty. Officer Owen testified to completing the vehicle inventory form … while performing the inventory search of the vehicle, which is also captured on Officer Owen's body camera footage. The body camera footage demonstrates that the officer is physically conducting the inventory search in a manner consistent with an inventory search, carefully removing items from the trunk and recording relevant information on the required form. The body camera footage, along with the testimony of Officer Owen, shows that Officer Owen searched the trunk of the Mustang and found a garment bag. Officer Owen then felt the green garment bag and stated, on video, that it felt like a rifle, based off of the feel, length and weight of the item in the bag. Officer Owen then unzipped the

---

[3] At the suppression hearing, Felder attempted to explain his connection to the Mustang, stating he was in the process of purchasing the vehicle and he had already obtained the title. (**See** N.T. Suppression Hearing, 8/3/21, at 99-100). Despite the issues concerning the Mustang's ownership, the Commonwealth did not argue that Felder lacked a privacy interest in the vehicle. (**Id.** at 132-58). To the extent that the Commonwealth mentioned these issues, it did so as a justification for impounding the vehicle and ordering the tow. (**Id.** at 149-54). Consequently, we do not address whether Felder had a reasonable expectation of privacy in the vehicle. **See Commonwealth v. Enimpah**, 630 Pa. 357, 368-69, 106 A.3d 695, 701 (2014) (stating it is the Commonwealth's burden to present evidence that defendant's constitutional rights were not infringed; Commonwealth may concede privacy interest, choosing to contest only legality of police conduct; if it does so, defendant's "reasonable expectation of privacy" need not be established); **Commonwealth v. Peak**, 230 A.3d 1220, 1224 (Pa. Super. 2020), *cert. denied*, ___ U.S. ___, 141 S.Ct. 1426, 209 L.Ed.2d 150 (2021) (stating the Commonwealth did not make argument regarding Felder's reasonable expectation of privacy in vehicle during suppression hearing; for that reason, the trial court did not address Felder's expectation of privacy, or lack thereof, in its opinion, and this issue is waived on appeal).

garment bag and found a large blue fabric case inside, which Officer Owen then opened revealing the SKS rifle.

(*Id.* at 17-18) (record citations omitted).

**B.**

On April 23, 2021, Felder filed an omnibus pretrial motion seeking the suppression of evidence. Felder argued that "Officer Harley did not have probable cause or reasonable suspicion to believe that [Felder] was armed and dangerous," and the officer conducted an illegal pat down that "was not incident to a valid arrest or consent." (Suppression Motion, filed 4/23/21, at ¶24). Felder also argued that the police conducted an illegal search of the vehicle which "was not pursuant to a lawful consent, a lawful arrest, a search warrant or a valid inventory search." (*Id.* at ¶27). On August 2, 2021, the court commenced a suppression hearing. The court received additional testimony on August 3, 2021. On August 4, 2021, the court denied the suppression motion and provided its findings of fact and conclusions of law.

Felder proceeded to a bench trial, and the parties stipulated to the incorporation of all evidence produced at the suppression hearing. At the conclusion of trial, the court found Felder guilty on all counts. On October 20, 2021, the trial court imposed a sentence of not less than four years to not more than ten years on each count of possession of firearms as well as a sentence of not less than two years to not more than seven years on the count of firearms without a license and two years of probation on the possession charge. All sentences were ordered to run concurrently with each other. The

court sentenced Felder to an aggregate term of four to ten years' imprisonment, followed by two years of probation. Felder did not file post-sentence motions.

Felder timely filed separate notices of appeal at each of the underlying docket numbers on November 18, 2021. On November 19, 2021, the court ordered Felder to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. After obtaining multiple extensions, Felder filed his Rule 1925(b) statement on March 30, 2022. On January 3, 2023, Felder filed an application in this Court to consolidate his appeals. This Court granted the application for consolidation on February 6, 2023.

> Felder now raises two issues for this Court's review:
>
> Did the trial court err in denying Felder's motion to suppress the illegal detention and search of Felder that resulted in the recovery of a handgun on Felder's person.
>
> Did the trial court err in denying Felder's motion to suppress the warrantless search of the vehicle he stepped out of and admitting the SKS rifle found during said search.

(Felder's Brief at 4).[4]

---

[4] The following principles govern our review of an order denying a motion to suppress:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the

*(Footnote Continued Next Page)*

**II.**

**A.**

In his first issue, Felder claims that Officer Harley approached the Mustang, and "what could have been a mere encounter immediately escalated into an investigative detention." (*Id.* at 27). Felder insists that Officer Harley did not possess reasonable suspicion of criminal activity to support the investigative detention. Felder emphasizes that 1) Officer Harley did not actually see Felder hiding or retrieving an object inside the vehicle; 2) Officer Harley had no reason to believe Felder's furtive movements were illegal; and 3) Officer Harley did not know whether a crime had occurred when he first saw Felder. Felder also asserts that the presence of a parked vehicle "late at night in a location consistent with criminal activity does not by itself create suspicion that the occupant of the vehicle is engaged in criminal activity." (*Id.*

---

Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Ford*, 175 A.3d 985, 989 (Pa. Super. 2017).

at 35). Under these circumstances, Felder concludes that the court erred by failing to suppress the firearm recovered from Felder's person. We disagree.

Contacts between the police and citizenry fall within three general classifications:

> The first [level of interaction] is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Bryant*, 866 A.2d 1143, 1146 (Pa. Super. 2005), *appeal denied*, 583 Pa. 668, 876 A.2d 392 (2005) (quoting *Commonwealth v. Phinn*, 761 A.2d 176, 181 (Pa. Super. 2000)).

An "investigative detention" is interchangeably labeled as a "stop and frisk" or a "*Terry* stop."[5] *Commonwealth v. Brame*, 239 A.3d 1119 (Pa. Super. 2020), *appeal denied*, ___ Pa. ___, 251 A.3d 771 (2021).

> An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of Article 1, Section 8 of the Pennsylvania Constitution. To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.

> \* \* \*

> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with

_____

[5] *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

- 10 -

reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity.

*Commonwealth v. Jones*, 874 A.2d 108, 116 (Pa. Super. 2005) (internal citations omitted).

**B.**

"[T]he question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity." *Commonwealth v. Cottman*, 764 A.2d 595, 598-99 (Pa. Super. 2000) (quoting *Commonwealth v. Beasley*, 761 A.2d 621, 625 (Pa. Super. 2000)). "These circumstances are to be viewed through the eyes of a trained officer, not an ordinary citizen." *Commonwealth v. Jackson*, 907 A.2d 540, 543 (Pa. Super. 2006), *appeal denied*, 593 Pa. 754, 932 A.2d 75 (2007).

> In making this determination, we must give due weight … to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Young*, 904 A.2d 947, 957 (Pa. Super. 2006), *appeal denied*, 591 Pa. 664, 916 A.2d 633 (2006) (internal citation and quotation marks omitted).

"[R]oadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect." *In re O.J.*, 958 A.2d 561, 564 (Pa. Super. 2008) (*en banc*), *appeal denied*, 605 Pa. 688, 989 A.2d 918 (2010). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that [their] safety or the safety of others was in danger." *Commonwealth v. Cooper*, 994 A.2d 589, 592 (Pa. Super. 2010), *appeal denied*, 608 Pa. 660, 13 A.3d 474 (2010). An officer's "observation of furtive movements, within the scope of a lawful stop, [can lead] him to reasonably be concerned for his safety and therefore justif[y] the *Terry* protective frisk." *Commonwealth v. Simmons*, 17 A.3d 399, 404 (Pa. Super. 2011), *appeal denied*, 611 Pa. 651, 25 A.3d 328 (2011). *See also Commonwealth v. Foglia*, 979 A.2d 357, 361 (Pa. Super. 2009) (*en banc*) (stating: "if a suspect engages in hand movements that police know, based on their experience, are associated with the secreting of a weapon, those movements will buttress legitimacy of a protective weapons search of the location where hand movements occurred"); *Commonwealth v. Tuggles*, 58 A.3d 840, 844 (Pa. Super. 2012) (explaining: "[w]here a person performs an activity that is indicative of an attempt to [hide] a weapon, that movement, regardless of whether it is singular or multiple, can support a belief that the person has a gun").

In this case, the suppression court concluded that Officer Harley conducted a legal *Terry* stop:

> In this case Officer Harley was investigating an abandoned 911 call, specifically the officer was investigating room 163 of the Knights Inn. Upon arrival he observes Mr. Dixon making gestures to the Mustang parked in front of room 163 and gesturing to Officer Harley's vehicle. When Officer Harley approached room 163, he observed Felder in the Mustang, with the lights off, reaching down and hunched over in the vehicle. Such movements are consistent with an individual either concealing or reaching for a weapon and thus justify Officer Harley's reasonable belief that … Felder may be armed and dangerous. Moreover, the fact that Officer Harley was outnumbered, by Felder and Mr. Dixon, the fact that Felder got out of the Mustang, without Officer Harley requesting he do so, and the fact that both Felder and Mr. Dixon were directly in front of room 163—the room from which the 911 call originated and thus the subject of Officer Harley's investigation—are relevant to the totality of the circumstances and establish that Officer Harley was warranted in his reasonable belief that his safety or the safety of others was in danger.

(Trial Court Opinion at 12) (internal citations omitted). Based on our review of the record, we cannot say that the court erred in reaching this conclusion.

We emphasize that this case involves a combination of facts that, when taken together, warranted further action by Officer Harley. *See Young*, *supra*. Significantly: 1) Officer Harley responded to an abandoned 911 call after dark; 2) the call originated from a motel room in a high-crime area; 3) upon arriving at the room where the call originated, Officer Harley was outnumbered by Felder and Mr. Dixon; 4) Officer Harley observed Felder's furtive movements inside the vehicle; and 5) after making the furtive movements, Felder exited the vehicle without prompting. Under the totality of these circumstances, Officer Harley's observations created a reasonable

concern for officer safety, which justified the **Terry** stop.  **See Simmons,**
**supra**; **Cooper**, **supra**.  Felder is not entitled to relief on his first claim.

### III.

### A.

In his second issue, Felder contends the police opted to tow the
Mustang, even though it was lawfully parked in a parking spot at the Knights
Inn.  Although the police claimed to have conducted an inventory search prior
to the tow, Felder maintains that the police engaged in an illegal, warrantless
search.

Citing **Commonwealth v. Brandt**, 366 A.2d 1238 (Pa. Super. 1976),
Felder insists there are two requirements that the Commonwealth must
demonstrate to justify an inventory search:  1) the vehicle was lawfully within
police custody; and 2) the search was, in fact, for the purpose of taking an
inventory of the owner's possessions to protect that property while it remains
in police custody.  Here, Felder maintains that the search was pretextual
because the police made no attempt to take an accurate inventory and protect
the property inside the Mustang.  Felder notes that the inventory list prepared
by Officer Owen did not include certain items of value, including a gold chain
hanging from the rearview mirror.  Felder also argues that Officer Owen "was
clearly looking for contraband" where the scope of the inventory search
included "the spare tire compartment, the engine compartment, and the door
on the fuel cap[.]"  (Felder's Brief at 47).  Under these circumstances, Felder

concludes that the court erred by failing to suppress the firearm recovered from the trunk of the Mustang.

In justifying the search, the Commonwealth contends that search of the car was voluntarily because Felder informed Officer Harley that he could "search everything" within seconds of the officer's initial approach. (Commonwealth's Brief at 10). The Commonwealth emphasizes that Officer Harley did not coerce Felder's consent where "[t]he officer did not have a weapon drawn, did not yell, [and] did not issue commands of any kind." (*Id.* at 10-11). The Commonwealth posits that Felder gave consent to search "without limitation and, based on the surrounding circumstances, clearly contemplated a search of the car that [Felder] had just come out of[.]" (*Id.* at 36). Moreover, the Commonwealth contends that Felder did not subsequently withdraw his consent. The Commonwealth contends that concludes that the police legally searched the Mustang pursuant to Felder's consent, and this Court should affirm the denial of the suppression motion on this basis of the voluntariness of the search. Before addressing Felder's argument that the inventory search was pretextual, we will first address the Commonwealth's contention.

**B.**

"Both the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee individuals freedom from unreasonable searches and seizures." *Commonwealth v.*

*Heidelberg*, 267 A.3d 492, 502 (Pa. Super. 2021) (*en banc*), *appeal denied*, ___ Pa. ___, 279 A.3d 38 (2022). "As a general rule, 'a warrant stating probable cause is required before a police officer may search for or seize evidence.'" *Id.* (quoting *Commonwealth v. Anderson*, 40 A.3d 1245, 1248 (Pa. Super. 2012)). Regarding automobiles, "Article I, Section 8 affords greater protection to our citizens than the Fourth Amendment, and … the Pennsylvania Constitution requires both a showing of probable cause and exigent circumstances to justify a warrantless search of an automobile." *Commonwealth v. Alexander*, ___ Pa. ___, ___, 243 A.3d 177, 181 (2020).

"Absent the application of one of a few clearly delineated exceptions, a warrantless search or seizure is presumptively unreasonable." *Heidelberg*, *supra* at 502 (quoting *Commonwealth v. Whitlock*, 69 A.3d 635, 637 (Pa. Super. 2013)). "One such exception is consent, voluntarily given." *Commonwealth v. Strickler*, 563 Pa. 47, 56, 757 A.2d 884, 888 (2000). "Whether an individual has voluntarily consented to a search 'is [a question of] fact which must be determined in each case from the totality of the circumstances.'" *Commonwealth v. Rosas*, 875 A.2d 341, 349 (Pa. Super. 2005), *appeal denied*, 587 Pa. 691, 897 A.2d 455 (2006) (quoting *Commonwealth v. Mancini*, 490 A.2d 1377, 1383 (Pa.Super. 1985)).

"The central Fourth Amendment inquiries in consent cases entail assessment of the constitutional validity of the citizen/police encounter giving rise to the consent; and, ultimately, the voluntariness of consent. Where the

underlying encounter is found to be lawful, voluntariness becomes the exclusive focus." ***Strickler***, ***supra*** at 56-57, 757 A.2d at 888-89 (internal citations and footnote omitted).

> [T]he Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances. As noted, while knowledge of the right to refuse to consent to the search is a factor to be taken into account, the Commonwealth is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent. Additionally, although the inquiry is an objective one, the maturity, sophistication and mental or emotional state of the defendant (including age, intelligence and capacity to exercise free will), are to be taken into account.

***Id.*** at 79, 757 A.2d at 901. "The test for the validity of a consent to search is the same for both the Fourth Amendment and Article I, Section 8, *i.e.*, that the consent is given voluntarily." ***Commonwealth v. Mack***, 568 Pa. 329, 334, 796 A.2d 967, 970 (2002).

## C.

Officer Harley testified that he arrived at the scene of the abandoned 911 call and he stopped his vehicle "just shy of being right in front of the room" where the call originated. (N.T. Suppression Hearing, 8/2/21, at 52). From his patrol car, Officer Harley observed Mr. Dixon standing in front of the door to Room 163. Mr. Dixon was "making gestures" to Felder, who was "sitting in a car which was parked directly in front of the door of 163." (***Id.*** at 54). Officer Harley exited his patrol car and "proceeded to walk to Room 163." (***Id.*** at 57). As he walked past the passenger side of Felder's vehicle,

Officer Harley observed Felder making furtive movements while seated in the driver's seat. At that point, Officer Harley pointed his flashlight toward the Mustang and asked Felder if he was reaching for anything. Without any prompting from Officer Harley, Felder exited the vehicle and said, "You can search everything." (*Id.* at 62). Thereafter, Officer Harley conducted the frisk and detained Felder.

Felder also testified at the suppression hearing. On direct examination, Felder explained that he first noticed Officer Harley "when he put his flashlight in my face." (N.T. Suppression Hearing, 8/3/21, at 95). Felder looked "to see where the light was coming from," and he exited the vehicle. (*Id.*) Felder acknowledged that Officer Harley asked whether he had tucked something into the compartment of the driver's side door. Based upon the officer's "tone of voice," Felder believed that he was not free to leave, and the officer was "interrogating" him. (*Id.* at 96). On cross-examination, Felder elaborated on his subsequent offer to search the vehicle:

> I said in regards to the door and the compartment. I told him he can search everything as far as the door and the compartment, not me or not—I didn't—I wasn't referring to me, or I wasn't referring to anything else as far as the car, because my car door was already open. He had already—I seen he had already had the flashlight through the other window on the door compartment looking in the compartment as I was getting out the car. So that's why I told him, I said, I'm not hiding nothing. You see what I'm —you see I'm getting out the car. I'm not hiding nothing. You can look and search right here, search everything.

(*Id.* at 109).

The trial court initially indicated that Felder did not limit the scope of his

voluntary consent:

> There's also an important factual thing, which is, when Officer Harley walks around the back of the Mustang and is asking, "Do you have any weapons," and has already asked, "What were you tucking into the door," and [Felder's] own testimony was that he says, "You could search any—everything."
>
> Now, [Felder] says he meant, like, the area of the door, which is where Officer Harley has some concerns, or expressed some concerns, but he didn't say—he didn't limit that. He said, "You could search everything."

(N.T. Suppression Hearing, 8/4/21, at 26).

While the trial court initially made that statement, it walked back that

statement by declining to reach that the issue was consensual, stating:

> There's also an important factual thing, which is, when Officer Harley walks around the back of the Mustang and is asking, "Do you have any weapons," and has already asked, "What were you tucking into the door," and Felder's own testimony was that he says, "You could search any— everything."
>
> Now, Felder says he meant, like, the area of the door, which is where Officer Harley has some concerns, or expressed some concerns, but he didn't say—he didn't limit that. He said, "You could search everything."
>
> **Now, the case doesn't really turn on any kind of consensual search idea, but in theory it could have**. **I don't know what that means, You can search everything**. That might have been consent to search the vehicle. It might have constituted a consent to pat-down or whatever. And it's—the Court has to consider that possibility.

N.T., 8/4/21, at 26-27 (emphasis added). The trial court also declined to

make an explicit finding that Felder consented to the pat down search, though

it acknowledged the possibility. *Id.* at 32 ("And Felder puts his hands up

immediately and says, You can search everything. And so, is the pat-down a consensual pat-down? Maybe."). Finally, in its opinion pursuant to Rule of Appellate Procedure 1925(a), the trial court discussed the inventory search at length without relying on Felder's purported consent to explain why suppression was denied. Trial Court Opinion, 5/2/22, at 13-22. Based on this full context, I would not elevate the trial court's initial comments about Felder's consent to a factual finding that is binding on this Court on appeal.

Additionally, we share the trial court's hesitation to find that Felder's statement, uttered immediately upon being approached by Officer Harley, constituted voluntary consent to search the entire vehicle after he had been placed under arrest. For consent to search to be constitutionally valid, it must be given intelligently and voluntarily. ***Commonwealth v. Valdivia***, 195 A.3d 855, 862 (Pa. 2018) (quotations & citation omitted). A consent search must be limited to the scope of the consent given, and that scope is determined based on a standard of objective reasonableness. ***Id.*** "We do not ascertain the scope of consent from the individual's subjective belief or the officer's understanding based on his or her training and experience, but based on what the typical reasonable person would have understood by the exchange between the officer and the suspect." ***Id.*** (cleaned up; citations omitted). Thus, the scope of consent provided is a fact-specific inquiry.

Felder cooperated with Officer Harley when he was approached. Officer Harley first said, "What did you just tuck in the door when I walked up here,"

to which Felder replied, "Nothing. You can search everything, bro. I didn't touch nothing." Commonwealth Exhibit 4 at 1:01-1:06. Felder then acquiesced to the pat down search, complying fully with Officer Harley's instructions, and was placed under arrest. Officer Harley did not search the driver's side door at that time.

After Felder was arrested and placed in the back of the police van, however, Officer Harley again asked for consent to search the vehicle. At that juncture, when the coercive pressure of the situation had increased from the initial interaction, Felder responded to Officer Harley's multiple requests for consent by stating that the vehicle did not belong to him. *Id.* at 10:12-11:02. Later, Felder asked Officer Harley to retrieve his cell phone from the vehicle and give it to one of his companions at the Knights Inn, again stating that the car did not belong to him. *Id.* at 24:15-24:45. At that point, Officer Harley approached the sergeant on scene and stated that he had permission to enter the car to look for Felder's phone, and another officer informed him that the phone was already in evidence. *Id.* at 24:55-25:32. The officers then decided to inventory and tow the vehicle. None of the officers on scene appeared to be proceeding on the belief that Felder had consented to a search.

Based on these circumstances, a reasonable person would not view Felder's initial statement to Officer Harley as blanket consent to search the entire vehicle, particularly after he had been placed under arrest and disclaimed ownership of the vehicle. *Valdivia*, *supra*. At best, once he was

- 21 -

placed under arrest, Felder authorized Officer Harley to retrieve his phone if it was in the car; when Officer Harley learned that the phone had already been placed into evidence, that consent was no longer relevant. As the record does not support the conclusion that Felder gave consent to search the entire vehicle, and the trial court did not make this factual finding, we decline to affirm the trial court's order on that basis.

**IV.**

**A.**

Now to the issue which the trial court decided whether the search of the vehicle was legal, which is whether the inventory search of the vehicle was a pretext to conduct an investigatory search for further evidence of a crime. Based on my review of the testimony, body camera footage, inventory policy and form, I conclude that it was.

Our Supreme Court has set forth the standards governing inventory searches of vehicles, which are distinct from investigatory searches intended to uncover evidence:

> The purpose of an inventory search is not to uncover criminal evidence, but to safeguard items taken into police custody in order to benefit both the police and the defendant. In the seminal case of [**South Dakota v. Opperman**, 428 U.S. 364, 369 (1976)], the high Court observed that inventory searches of impounded vehicles serve several purposes, including (1) protection of the owner's property while it remains in police custody; (2) protection of the police against claims or disputes over lost or stolen property; (3) protection of the police from potential danger; and (4) assisting the police in determining whether the vehicle was stolen and then abandoned.

An inventory search of an automobile is permissible when (1) the police have lawfully impounded the vehicle; and (2) the police have acted in accordance with a reasonable, standard policy of routinely securing and inventorying the contents of the impounded vehicle. In **Commonwealth v. Henley**, [909 A.2d 352, 359 (Pa. Super. 2006) (*en banc*)], the Pennsylvania Superior Court, citing **Opperman**, explained:

> In determining whether a proper inventory search has occurred, the first inquiry is whether the police have lawfully impounded the automobile, i.e., have lawful custody of the automobile. The authority of the police to impound vehicles derives from the police's reasonable community care-taking functions. Such functions include removing disabled or damaged vehicles from the highway, impounding automobiles which violate parking ordinances (thereby jeopardizing public safety and efficient traffic flow), and protecting the community's safety.
>
> The second inquiry is whether the police have conducted a reasonable inventory search. An inventory search is reasonable if it is conducted pursuant to reasonable standard police procedures and in good faith and not for the sole purpose of investigation.

> A protective vehicle search conducted in accordance with standard police department procedures assures that the intrusion is limited in scope to the extent necessary to carry out the caretaking function.

**Commonwealth v. Lagenella**, 83 A.3d 94, 102-03 (Pa. 2013) (cleaned up; citations omitted).

**B.**

Here, because Felder's argument focuses on the second inquiry – whether the search was conducted in good faith – it is necessary to address the first inquiry to fully assess the reasonableness of the search because "[a] questionable impoundment is one factor of circumstantial evidence of

improper motive." **Henley**, **supra**, at 365 (citation omitted). Because the vehicle here was legally parked at the Knights Inn, did not raise any public safety issues, and Felder's companion was staying at the hotel, we find the decision to impound the vehicle to be at least "questionable."

When a law enforcement officer discovers that a vehicle is unregistered on a "highway or trafficway" or the driver cannot legally operate the vehicle, he or she must immobilize the vehicle or, "*in the interest of public safety,*" impound the vehicle. 75 Pa.C.S. § 6309.2(a) (emphasis added). Immobilization differs from impoundment in that the former refers to merely stopping the vehicle in place, such as with a boot device, while the latter refers to towing and storing the vehicle in a secure area. **Lagenella**, **supra**, at 100. If a vehicle is immobilized, the operator or owner has 24 hours to appear at the relevant judicial office to furnish proof that the pertinent defects have been remedied and obtain a certificate of release. 75 Pa.C.S. § 6309.2(b). If he or she has not done so within 24 hours, only then will the vehicle be impounded. **Id.**

Impounding a vehicle may serve legitimate community-caretaking purposes such as protecting public safety. **Lagenella**, **supra**, at 102-03. "While it may be true that an arrestee's vehicle may be exposed to danger if it is left legally parked on the public street in a high-crime area, this concern, standing alone, is inadequate to override the reasonable expectations of privacy enjoyed by our citizens, defendants and non-defendants alike."

*Commonwealth v. Hennigan*, 753 A.2d 245, 259-60 (Pa. Super. 2000). Thus, "where the sole issue is the safety of a defendant's legally parked vehicle pending an arrest, the police do not have the authority to impound said vehicle absent some reasonable nexus to the alleged crime or to a community care-taking responsibility." *Id.*

On the record before us, impounding the vehicle as opposed to immobilizing it for the statutory 24-hour period was not required under the police's community-caretaking function. Nothing in the record suggests that any employee of the Knights Inn requested that the vehicle be removed following Felder's arrest. *See* 75 Pa.C.S. § 3353(b)-(c) (related to unattended vehicles on private property); 75 Pa.C.S. § 3352(c)(4) (removal by police of vehicles on private property). The vehicle was legally parked and could have been immobilized to allow Felder or someone else of his choosing to remedy the title defects that had been uncovered and have a licensed driver appear at the district court office to retrieve the vehicle. *See* 75 Pa.C.S. § 6309.2(b). In the meantime, valuables in the vehicle could have been secured, again, by someone of Felder's choosing, such as Mr. Dixon. As can be seen, there was no reason for the police in this instance to immediately impound the vehicle rather than simply immobilizing it for 24 hours or to seek a search warrant to conduct an investigatory search.

Moreover, the officers' concern about releasing the vehicle to Mr. Dixon was not justified. They explained that Mr. Dixon was intoxicated and not able

to safely drive the vehicle, with Officer Harley going so far as to suggest that he could be liable if Mr. Dixon harmed someone while driving under the influence. N.T. Suppression Hearing, 8/2/21 at 144, 147-48. While this might have been a colorable concern if the vehicle was parked at a gas station, restaurant or bar, here, the vehicle was legally parked at a hotel. Patrons of hotels routinely spend the night or even several days on the premises without moving their vehicles. Nothing in the record suggests that if the keys to the vehicle had been released to Felder's companion, he would have operated the vehicle while intoxicated rather than simply returning to his own hotel room. While there were concerns arising from the vehicle's title defects and Felder's statements at the scene, the decision to impound the vehicle was "questionable" and casts doubt on the validity of the officers' motives for conducting the inventory search. **Henley**, **supra**.

## C.

Now as to whether the inventory search was, in fact, a pretext for an investigatory search. Felder maintains that the search did not protect the property in the vehicle or adequately protect the officers from claims regarding lost or stolen property. He highlights that the inventory sheet completed by Officer Owens failed to note a gold chain and ring hanging from the rearview mirror of the vehicle. He argues that the search was extensive, including the engine compartment, the door on the fuel cap and the trunk, but nonetheless failed to note this item of clear value located in plain view. Accordingly, he

concludes that the officers were not, in fact, motivated by community-caretaking concerns.

The Bensalem Township Police Department's motor vehicle inventory policy (the Policy) provides that an inventory search "will extend to all areas of the vehicle where personal property or hazardous materials may reasonably be found, including but not limited to, the console, passenger compartment, trunk, glove compartment, storage compartments and any containers." Commonwealth Exhibit CS-6, 8/3/21, § II.E.2. "Items of personal property that are of significant value will be removed from the vehicle and secured for safekeeping," and such items must be noted on a Property Receipt and Vehicle Inventory Form submitted to the department's Evidence Custodian. *Id.*, § II.F.3 & F. The Inventory Form must include a "detailed description of the items discovered and a detailed description of where the item was located in the motor vehicle." *Id.*, § IV.B.1. The Policy also requires a Property Receipt to be completed for any items removed from the vehicle, *id.*, § IV.C, but the Inventory Form must additionally list items that remain in the vehicle, *id.*, § IV.B.2.a.

Discrepancies between the body camera footage of the inventory search and the Vehicle Inventory Form completed in this case lead me to conclude that the search was not reasonable or conducted for community-caretaking purposes. The form includes two categories of property: items seized and items remaining in the vehicle. For items seized, Officer Owens listed only the

rifle at issue in this case. For items remaining in the vehicle, he wrote: "trunk—various books and misc junk items including fire extinguisher, tools, books, cleaning supplies." Exhibit DS-1, 8/2/21.

The gold chain and ring are not included on the form, nor does the list separately account for the myriad of items left in the vehicle or for their specific location therein as required by the Policy. At the suppression hearing, Officer Owens admitted that he did not itemize everything in the vehicle but instead generalized his findings, apparently in contravention of the requirement that the form include a "detailed description of the items discovered and a detailed description of where the item was located in the motor vehicle." Commonwealth Exhibit CS-6, 8/3/21, § IV.B.1; N.T., 8/3/21 at 46. If the purpose of the impoundment and inventory search was to protect Felder's possessions, a gold chain and ring of actual value would have been important to seize and note on the Inventory Form and Property Receipt. That this item was overlooked when it was hanging from the rearview mirror in plain view while the officers spent much of the search rifling through the detritus in the trunk and passenger compartment without itemizing what they found indicates that the purpose of the search was to locate contraband.

Officer Owens also acknowledged on cross-examination that the Policy requires an officer to stop the search and contact the on-call assistant district attorney if contraband is found during an inventory search, and "there is sufficient probable cause to believe a crime has been committed and that

further evidence or fruits thereof may be found in the motor vehicle." **See** Commonwealth Exhibit CS-6, 8/3/21, § II.E.4; N.T., 8/3/21 at 71-72. He did not, however, stop searching the vehicle upon discovering the rifle. He also did not consult with his supervising officer who was on scene to decide whether to obtain a search warrant in accordance with the policy. N.T., 8/3/21 at 72. Rather, he continued the search on the assumption that his supervisor would have instructed him to stop if he felt it was necessary to obtain a warrant. **Id.** ("I did not, but based off of prior experiences with my supervisor, if he felt, he would have stopped."). The trial court explained that "the search [got] a little more aggressive after they [found] that rifle" and postulated that it may have suppressed any additional evidence if it had been uncovered after that point. N.T., 8/4/21, at 46-47. However, what the failure to seek a search warrant at this juncture indicates is that the purpose was not to conduct an inventory search but had been investigatory since its inception.

To summarize, several circumstantial factors lead to the conclusion that the search of Felder's vehicle was a warrantless, investigatory search rather than a constitutional inventory search. First, impoundment of the vehicle rather than immobilization was not supported by statute or necessary under the specific circumstances of this case, rendering the decision to impound the vehicle questionable. Second, the Inventory Form does not comply with the Policy by itemizing in detail the items left in the vehicle. Third, the officers did not find or seize items of value in plain view—the gold chain and ring on

the rearview mirror—despite the stated purpose of the inventory being to safeguard Felder's possessions. That they searched the engine compartment and fuel door cap without noticing the gold chain and ring demonstrates that the focus of the search was uncovering contraband. Finally, the officers did not comply with the Policy to seek a warrant or even discuss doing so immediately after uncovering contraband in the vehicle. Based on these facts, we reverse trial court's denial of Felder's motion for suppression of the rifle.

Accordingly, we reverse the counts involving the rifle at No. 2334 of 2020 for carrying firearms without a license and at No. 5807 of 2020 of persons not to possess firearms. However, because the reversal of those counts does not upset the sentencing scheme since both of those counts ran concurrently with the other counts involving possession of firearms, we need not remand for resentencing.

Judgment of sentence affirmed in part and reversed in part.

Judge Sullivan joins the Memorandum.

Judge King Noted Dissent.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/21/2023