J-S30019-25

2025 PA Super 211

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANDRE N. FULTON | : | No. 686 EDA 2025 |

Appeal from the Order Entered February 13, 2025
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0003402-2023

BEFORE: OLSON, J., MURRAY, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY MURRAY, J.:                    **FILED SEPTEMBER 19, 2025**

The Commonwealth of Pennsylvania appeals from the order granting the pretrial suppression motion filed by Andre N. Fulton (Appellee). The Commonwealth argues the suppression court erred by finding police unlawfully (1) performed a pat-down search of Appellee's person, where he was not under arrest and police had no suspicion he was armed or dangerous; (2) exceeded the scope of Appellee's consent, when conducting a warrantless search of Appellee's vehicle for certain items that Appellee asked police to retrieve; and (3) seized contraband from an opaque plastic bag in Appellee's vehicle that police discovered during the search. After careful review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

The suppression court summarized the evidence presented at Appellee's suppression hearing in its order granting suppression:

> On March 16, 2023, at 12:45 a.m., [Pennsylvania State Police] Trooper Adam Shutter [(Trooper Shutter)] and Trooper Curtis Matthews [(Trooper Matthews) (collectively, "the Troopers")] received a report of a male having a medical emergency at the Peter J. Camiel Service Plaza, [a] Pennsylvania Turnpike rest area [(the Plaza). N.T. (suppression hearing), 2/10/25, at 6, 21]. [Appellee] was seated at a table inside the Plaza. [*Id.* at 6-7, 22.] Trooper Shutter testified at [the suppression hearing] … that [Appellee] was sweaty and said he had taken an ecstasy pill earlier in Philadelphia, and was not feeling well. [*Id.* at 22; *see also id.* at 8 (Trooper Matthews's consistent testimony).] [Appellee] requested emergency medical [services] ("EMS"). [*Id.* at 8, 22.] EMS [personnel] arrived and determined that [Appellee] needed to be transported to Reading Hospital for treatment. [*Id.* at 8, 24.] **Trooper Shutter testified that he** [**performed**] **a "pat down" of** [**Appellee's**] **person to ensure he had no weapons before he got into the ambulance.** [*Id.* at 24-25.][1]

_____

[1] Regarding the pat-down search, Trooper Shutter testified at the suppression hearing as follows:

> [Appellee] didn't have weapons on him. I believe he emptied his own pockets out for me. [**Appellee**] **had a small piece of a plastic straw** [(the straw), which was] a couple of inches long[,] in his one pocket[,] with some loose change.

N.T., 2/10/25, at 25 (emphasis added). Significantly, on cross-examination, **Trooper Shutter confirmed that, prior to performing the pat-down search, he did not "have any indication at that point that** [**Appellee**] **may have had weapons on him**[**.**]**"** *Id.* at 38 (emphasis added); *see also id.* at 11 (Trooper Matthews testifying that Appellee "wasn't combative[ or] … argumentative" before the pat-down). Trooper Shutter elaborated that it is his "standard practice" to perform a pat-down search of "any individual that is being transported [by EMS personnel] I had interaction with," to ensure "the EM[S]s' safety." *Id.* at 38, 39; *see also id.* at 39 (Trooper Shutter confirming on cross-examination that he "**automatically** pat[s] down anybody going into an ambulance for weapons, for possible safety[.]" (emphasis added)). The Troopers' testimony established Appellee was not

*(Footnote Continued Next Page)*

Both Trooper Matthews and Trooper Shutter testified that [Appellee] stated he did not have his cell phone and keys [to his vehicle ("keys" or "key")] with him in the Plaza. [*Id.* at 10 (Trooper Matthews confirming that Appellee was "the first person to bring up his cell phone and his keys."); *id.* at 26 (Trooper Shutter's consistent testimony).] [**Appellee**] **requested that** [**the Troopers**] **enter his vehicle to locate the cell phone and keys.** [*See id.* at 11, 26-27.][2] [The Troopers walked to Appellee's car, discovered it was unlocked, and opened the driver's side door. *Id.* at 29.] [Trooper Matthews immediately] found [Appellee's] cell phone on the [driver's seat] floor. [*Id.*] [The Troopers continued] search[ing] the vehicle for [Appellee's] keys and found a [black] plastic [grocery] bag … on the rear floor.

_____

under arrest or in restraints at the time of the pat-down search. *Id.* at 22, 25. Finally, there is no record evidence that police performed chemical testing on the straw or discovered narcotics on it.

[2] Pertinent to the instant appeal is the scope of Appellee's consent for the Troopers to look inside his vehicle for specified items. At the suppression hearing, Trooper Shutter testified that when "[Appellee] realized that he was going to the hospital[,] he asked [the Troopers] to get his cell phone and his keys out of his vehicle." N.T., 2/10/25, at 26; *see also id.* at 11 (Trooper Matthews testifying that once Appellee "found out he was going to the hospital, obviously, his cell phone and his keys are important. [Appellee] did not want his vehicle out there being left unlocked with his phone in it. So he clearly asked [the Troopers] to go out and get his cell phone and keys."). Trooper Shutter testified that after Appellee informed the Troopers of the make and model of his vehicle, Trooper Shutter "asked [Appellee] if [the Troopers] had permission to go in his vehicle to get his keys and his cell phone." *Id.* at 27. According to Trooper Shutter, "[Appellee] said sure." *Id.*; *see also id.* (Trooper Shutter stating that Appellee's demeanor was calm). The Troopers presented no testimony as to whether Appellee gave them any indication where he thought the keys might be located. On cross-examination of Trooper Matthews, Appellee's counsel questioned him, "**You didn't ask** [**Appellee**] **for consent to search the vehicle?**" *Id.* at 18 (emphasis added). Trooper Matthews responded: "**No. Absolutely not.**" *Id.* (emphasis added); *see also id.* at 40 (Trooper Shutter testifying on cross-examination that the Troopers never "use[d] the word consent" when speaking with Appellee).

[*Id.* at 30.]³  **The contents of the bag were not visible.**  [*Id.* at 44.]⁴  Trooper Shutter [immediately] opened the bag and found

_____

³ Trooper Shutter testified that the Troopers initially searched areas of Appellee's vehicle in which an individual might predictably leave their keys, including the glove box, floorboard, and doors, to no avail.  N.T., 2/10/25, at 30.  However, Trooper Shutter explained that he was certain the keys were located somewhere inside of Appellee's vehicle, since the vehicle had "a push button start" and the engine started when Trooper Shutter depressed the ignition button.  *Id.*  Trooper Shutter conceded on cross-examination that **following the Troopers' initial inability to locate the keys, they "didn't return to [Appellee] and say can you give [the Troopers] a better idea of where the key might be, we can't find it?**" *Id.* at 44 (emphasis added).  The Troopers continued searching Appellee's vehicle for his keys and noticed a sealed cardboard box on the back seat, which they did not open or search.  *Id.* at 30-31.  Trooper Shutter testified that he then saw, on the rear passenger floor, a "black plastic bag.  I opened up the bag, which is where I discovered the drugs[.]"  *Id.* at 31-32.  Trooper Shutter confirmed that police did not "locate the keys in the area by where the plastic bag containing the drugs were[.]"  *Id.* at 32.  Trooper Shutter further confirmed that the "only narcotics that were seized during the course of this entire investigation [were] the ones that were located in the plastic bag that [Trooper Shutter] found in the backseat[.]"  *Id.* at 36.

⁴ During Appellee's cross-examination of Trooper Shutter, the following exchange occurred regarding the black plastic bag:

Q. [(Appellee's counsel):] And the bag was on the floor?

A. [(Trooper Shutter):] Yes.

Q. This bag, was it see[-]through?

A. It was black.

* * *

Q. **You cannot see the contents of the bag before you opened it?**

A. **Correct.**

*(Footnote Continued Next Page)*

white powder in the bag. *Id.* at 32. Trooper Shutter found the keys to [Appellee's] vehicle underneath an ashtray in the center console. [*Id.*] The [white powder was] seized and entered into evidence. [*Id.* at 34.] [Appellee's] vehicle was towed and entered into evidence. [*Id.* at 35.]

On March 17, 2023, police obtained a search warrant to search [Appellee's] vehicle. [*Id.* at 35-36.] The seized [white powder was subsequently] tested and identified as heroin, fentanyl and xylazine.[5]

Order, 2/13/25, at 1 n.1 (emphasis and footnotes added; paragraph formatting and punctuation modified).

After Appellee's arrest, on June 20, 2023, the Commonwealth filed a criminal complaint charging him with possession of a controlled substance, possession with intent to deliver a controlled substance, and possession of

_____

Q. When you finished looking around [Appellee's] vehicle initially, you didn't return to [Appellee] and say can you give me a better idea of where the [car] key might be, [as the Troopers] can't find it?

A. No.

Q. You didn't go back and ask [Appellee,] can I open any packages in the vehicle?

A. No.

Q. You didn't ask for any further clarification at this point before you opened the bag on the floor, correct?

A. Correct.

N.T., 2/10/25, at 43-44 (emphasis added).

[5] It is undisputed that the white powder contained controlled substances.

- 5 -

drug paraphernalia.[6]  After several continuances, Appellee filed a counseled suppression motion on September 18, 2024.  Appellee asserted that the Troopers unlawfully seized the narcotics found inside the plastic bag, where, *inter alia*, "[Appellee's] vehicle was subjected to an improper search, including closed containers and items located within said vehicle."  Motion to Suppress, 9/18/24, ¶ 4(c).

The suppression court conducted a suppression hearing on February 10, 2025, wherein the only witnesses were the Troopers and Appellee.  The Troopers testified consistently with our recitation *supra*.  Appellee testified, contrary to the Troopers, that he did not ask the Troopers to retrieve any item from his vehicle, and did not consent to a search of the vehicle.  N.T., 2/10/25, at 59.  Appellee alleged his cell phone was on his person while inside the Plaza. *Id.*  According to Appellee, "in the presence of the [Troopers]" and EMS personnel, Appellee placed a call to his girlfriend while inside the Plaza, which, Appellee alleged, was corroborated by his phone records.  *Id.* at 65.

Following the conclusion of testimony, the suppression court considered argument from the parties on the suppression motion.  *See id.* at 80-96. According to the prosecutor, "during the [course] of this mere encounter with police officers, … [Appellee gave] consent for the vehicle to be searched." *Id.* at 88; *see also id.* at 89 (the prosecutor asserting that even though Appellee

_____

[6] 35 P.S. § 780-113(a)(16), (30), (32).

was intoxicated at the time of his interaction with the Troopers, he was "clearly in a state where he [was] able to give consent."). The prosecutor further averred the testimony established that "[Appellee] initiated the conversation about the search [of Appellee's] car by inquiring about his phone and his keys." *Id.* at 90; *see also id.* at 91 (the prosecutor arguing that "[b]ased on the testimony of the [T]roopers, they didn't ask [Appellee] out of the blue, … hey, can we search your car[?]"). The prosecutor "submit[ted] that it is much more credible to believe that [Appellee] didn't have his cell phone on" his person, when inside the Plaza. *Id.* at 90. The Commonwealth further asserted it was "reasonable [for the Troopers] to start looking in containers such as the plastic bag, when [Appellee's] keys [we]re not … visible, but they're clearly somewhere [inside the vehicle] because the vehicle started" when Trooper Shutter activated the push-button ignition. *Id.* at 94.

Appellee, on the other hand, argued that Trooper Shutter's pat-down of Appellee's person for a weapons check was unlawful, where Trooper Shutter conceded in his testimony that "there was no[] concern for safety of weapons." *Id.* at 81; *see also id.* at 38 (Trooper Shutter's above-described confirmation that prior to performing the pat-down search of Appellee's person, Trooper Shutter did not "have any indication at that point that [Appellee] may have had weapons on him"). Appellee further argued the Troopers unlawfully exceeded the limited scope of Appellee's permission for the Troopers to search his vehicle only for his keys and cell phone:

[I]t was not really a complete consent. The best … light we can put to this is [that Appellee] said [to the Troopers,] I want my keys, I want my cell phone. If those things were said, and without further instruction on what to do[,] … [w]e didn't get a consent to search, we didn't get specifics. This is going to be overly broad in what [the Troopers were] doing, and going place by place in the vehicle[.]

*Id.* at 83-84. Appellee characterized the Troopers's all-encompassing search of his vehicle as being "more in line [with] a seizure of items, as oppose[d] to a … reasonable search for where the key may be." *Id.* at 84; *see also id.* at 85 (Appellee arguing that, after the Troopers's initial struggle to locate Appellee's keys, and their observation of the black plastic bag, the Troopers "could have gone to [Appellee in the Plaza] and said, hey, there's a bag in the backseat, might [the keys] be in there? That would have been a reasonable expectation for … law enforcement to do[.]"). The suppression court deferred ruling on the suppression motion.

On February 13, 2025, the suppression court entered the order underlying this appeal, which granted Appellant's suppression motion. Five days later, the Commonwealth filed a motion for reconsideration asking the suppression court to "reconsider its suppression of the black plastic bag and its contents."[7] Motion for Reconsideration, 2/18/25, ¶ 11. According to the Commonwealth, suppression of this evidence was inappropriate

because 1) [Appellee] gave consent to search the vehicle to retrieve his cell phone and keys; 2) [Appellee] did not limit his

_____

[7] The motion for reconsideration did not challenge the suppression of the straw.

- 8 -

consent nor revoke it at any point; 3) Trooper Shutter was objectively reasonable for searching the black plastic bag for the key, and therefore, the search was within the confines of the consent given by [Appellee]; and 4) the seizure of the drugs was permitted under the plain view exception [to the warrant requirement (discussed *infra*)] once Trooper Shutter, who was lawfully searching the black plastic bag, immediately observed the incriminating contents inside the bag.

*Id.* ¶ 24 (punctuation modified); *see also id.* ¶ 20 ("[Appellee's] consent extended to the black plastic bag because Trooper Shutter reasonably believed the keys – which he knew had to be nearby since the vehicle started – could be inside."). Appellee filed a response to the motion for reconsideration on February 20, 2025.

The suppression court denied the motion for reconsideration on February 24, 2025. The Commonwealth timely filed a notice of appeal on March 13, 2025.[8] On the same date, the Commonwealth filed a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b),[9]

_____

[8] In filing this interlocutory appeal, the Commonwealth complied with Pa.R.A.P. 311(d), which provides that "[i]n a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case[,] where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution." *Id.*; *see also Commonwealth v. Petty*, 157 A.3d 953, 954 n.1 (Pa. Super. 2017) (citing Rule 311(d) and stating, "[t]he Commonwealth may appeal an interlocutory order suppressing evidence when it provides a certification with its notice of appeal that the order terminates or substantially handicaps the prosecution.").

[9] The suppression court did not issue an order directing the Commonwealth to file a Rule 1925(b) concise statement.

asserting 10 allegations of error. The suppression court filed its Rule 1925(a) opinion on April 1, 2025.

The Commonwealth presents three issues for our consideration:

I. Whether the [suppression] court erred in concluding that Trooper Shutter exceeded the scope of [Appellee's] consent to search his vehicle when he opened a black plastic bag[,] looking for [Appellee's] car key?

II. Whether the [suppression] court erred in misapplying the law governing consent and holding that the drugs contained in the black plastic bag located in [Appellee's] car were not in plain view?

III. Whether the [suppression] court erred in holding that the evidence seized pursuant to a lawful pat-down search should be suppressed?

Commonwealth's Brief at 9 (capitalization modified).

We are mindful of our standard of review:

When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. Where the defendant prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Tillery*, 249 A.3d 278, 280-81 (Pa. Super. 2021) (citation and brackets omitted)

"We are highly deferential to the suppression court's factual findings and credibility determination[s]." **Commonwealth v. Carmenates**, 266 A.3d 1117, 1123 (Pa. Super. 2021) (*en banc*); **see also Commonwealth v. Byrd**, 185 A.3d 1015, 1019 (Pa. Super. 2018) ("The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." (citation omitted)). "If the record supports the suppression court's findings, we may not substitute our own findings." **Id.**

Where a defendant files a motion to suppress evidence, "[t]he Commonwealth shall have the burden of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of the defendant's rights." Pa.R.Crim.P. 581(H); **see also id.**, Comment (stating that the standard of proof is a preponderance of the evidence).[10] The Commonwealth "satisfies [its preponderance of the evidence] burden if it proves to the satisfaction of the suppression court that the evidence was properly seized." **Commonwealth v. Smith**, 304 A.3d 35, 39 (Pa. Super. 2023) (citation omitted); **see also Anderson**, 2025 Pa. LEXIS 1101, at *22 ("The Commonwealth may sustain its threshold preponderance burden by means of circumstantial evidence.").

---

[10] "A preponderance of the evidence is tantamount to a more likely than not inquiry." **Commonwealth v. Anderson**, ___ A.3d ___, 2025 WL 2055935, 2025 Pa. LEXIS 1101, at *22 (Pa. filed July 23, 2025) (citation, brackets, ellipses and quotation marks omitted).

Instantly, we simultaneously address the Commonwealth's first and second issues, as they are interrelated. In its first issue, the Commonwealth argues that the suppression court improperly suppressed the narcotics the Troopers found inside the black plastic bag, during a lawful search of Appellee's vehicle performed with Appellee's consent. *See* Commonwealth's Brief at 19-33. The Commonwealth contends "[Appellee's] request for the Troopers to retrieve his cellular phone and car key from his vehicle constituted consent, or, at a minimum, implied consent to search his entire vehicle, including any contents where these items could be located." *Id.* at 23 (punctuation modified). According to the Commonwealth, the Troopers properly "limited the scope of their search to objectively reasonable areas to look for the car key[s]." *Id.* at 23; *see also id.* ("Significantly, the Troopers refrained on their own accord from searching portions of the car[,]" including the sealed cardboard box discovered on the vehicle's backseat).

> Once the Troopers realized that [Appellee's] car key was somewhere inside his car, it was logical and reasonable to infer that the car key could be secreted anywhere inside the vehicle, including inside a bag. Thus, Trooper Shutter's opening of the plastic bag was objectively reasonable within the scope of the consent to search for a car key.

*Id.* at 23-24.

In its second issue, the Commonwealth argues that the suppression court "erred in misapplying the law governing consent and holding that the black plastic bag containing a large quantity of drugs was not in plain view." *Id.* at 34. According to the Commonwealth, Trooper Shutter lawfully "emptied

the bag based on [Appellee's] consent[, ]not because anything was in plain view." *Id.* at 35 (emphasis omitted). The Commonwealth contends the suppression court, in its Pa.R.A.P. 1925(a) opinion,

> erred in finding that [] Trooper [Shutter] had to "immediately discern the contents of the black bag," or have "probable cause" before opening the bag. …. The [suppression] court's abuse of discretion was when it misapplied the law governing the Trooper's reason for searching the bag. The Trooper was permitted to open the bag because he had [Appellee's] consent to do so. Contrary to the [suppression] court's conclusion, the opening of the bag looking for [Appellee's] key was not based on the plain view doctrine. The plain view doctrine did not apply until **after** the drugs inside the bag were lawfully emptied out.

*Id.* at 34-35 (emphasis in original) (quoting Suppression Court Opinion, 4/1/25, at 9, 10); *see also id.* at 37 ("[A]fter emptying the bag's contents, instead of [Appellee's] key, [] Trooper [Shutter] observed the drugs in plain view.").

The Commonwealth further claims that "[i]n reaching its erroneous conclusion, the [suppression] court[, in its Pa.R.A.P. 1925(a) opinion, improperly] relied on *Commonwealth v. Newman*, 84 A.3d 1072 (Pa. Super. 2014)," a case which "did not involve consent." Commonwealth's Brief at 36 (emphasis and footnote omitted); *see also id.* ("The [suppression] court erroneously relied on the *Newman* [C]ourt's plain view analysis[,]" which, the Commonwealth asserts, was *obiter dicta* and, therefore, not precedential, "where consent was not an issue in" *Newman*).

Appellee counters the suppression court properly exercised its discretion in suppressing the narcotics found in the opaque plastic bag, where (1) the

Troopers exceeded the scope of Appellee's permission for the Troopers to look inside his vehicle only for his phone and keys; and (2) the contraband was not in plain view. *See* Appellee's Brief at 14-27. According to Appellee, the suppression court correctly "determined that [Appellee], who was under medical distress, who was not under arrest, and who was seeking his car key and cell phone, did not give unlimited consent to the [Troopers] to search his vehicle." *Id.* at 14. Appellee points out that the testimony at the suppression hearing established that (1) Appellee gave the Troopers permission to retrieve only his phone and keys from his vehicle; and (2) the Troopers did not "specifically ask[] [Appellee] if they could 'search' [Appellee's] vehicle," or "explain[] a consent search to [Appellee]." *Id.* at 19; *see also id.* at 21 ("[Appellee] did not give the [Troopers] general consent to search").

> Appellee claims that
>
> [b]ased on the exchange between [Appellee] and the [T]roopers, a reasonable person in [Appellee's] position would believe that the [Troopers] would simply enter his vehicle and retrieve his phone and keys. While Trooper Matthews immediately found [Appellee's] cell phone, the keys were not readily located. Instead of returning to [Appellee] to obtain more information regarding the location of the keys, the [T]roopers proceeded to conduct a more extensive search, including the opening of the black plastic bag. The search of the bag exceeded the bounds of [Appellee's] consent.

*Id.* at 20; *see also id.* at 20-21 ("In this context, a reasonable person would not expect the [Troopers] to conduct a thorough or extensive search, including the opening of innocent-looking closed containers."). Appellee points out that, under Pennsylvania law, "the burden is on the police to conduct a search within

- 14 -

the parameters of the consent given." *Id.* at 20. Finally, Appellee claims that the suppression court "correctly applied the law by holding that the drugs contained in the black plastic bag were not admissible under the plain view exception to the warrant requirement." *Id.* at 25; *see also id.* (pointing out that at the suppression hearing, "Trooper Shutter acknowledged that he could not see inside the black plastic bag." (citing N.T., 2/10/25, at 46)). "[T]he bag itself was not immediately apparent to be incriminating. It was only after Trooper Shutter opened the bag that he saw drugs." *Id.*

"Under both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, searches conducted in the absence of a search warrant are *per se* unreasonable, unless they satisfy one of the recognized exceptions to the warrant requirement." *Commonwealth v. Hunte*, 337 A.3d 483, 498 (Pa. 2025) (citations omitted); *see also Commonwealth v. Saunders*, 326 A.3d 888, 896 (Pa. 2024) ("Protection of reasonable expectations of privacy is the primary purpose of the prohibition against unreasonable searches and seizures." (citation omitted)). "One such exception exists when a person consents to the search." *Hunte*, 337 A.3d at 498; *see also Commonwealth v. Strickler*, 757 A.2d 884, 888 (Pa. 2000).

Our Supreme Court explained the consent exception in *Commonwealth v. Valdivia*, 195 A.3d 855 (Pa. 2018):

> [W]e have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have

- 15 -

been permitted to do so. Although a warrantless, but consensual, search is constitutionally permissible, obtaining consent is an investigative tool utilized by law enforcement. It allows police to do what otherwise would be impermissible without a warrant. **As a consent search is in derogation of the Fourth Amendment, there are carefully demarked limitations as to what constitutes a valid consent search.**

First, consent must be voluntarily given during a lawful police interaction. For a finding of voluntariness, the Commonwealth must establish that the consent given by the defendant is the product of an essentially free and unconstrained choice — not the result of duress or coercion, express or implied, or a will overborne — under the totality of the circumstances.

If consent is given voluntarily, **the ensuing search must be conducted <u>within the scope of that consent.</u>** The standard for measuring the scope of an individual's consent is one of **objective reasonableness.** We do not ascertain the scope of consent from the individual's subjective belief or the officer's understanding based on his or her training and experience, but based on what the typical reasonable person would have understood by the exchange between the officer and the suspect.

*Id.* at 861-62 (citations, footnotes, ellipses, and quotation marks omitted; emphasis added).

The *Valdivia* Court further stated that

[w]hile an individual may place limits on the scope of any consent given, or revoke consent altogether, the failure to do so does not modify the consent to the search that was given, nor does it give police carte blanche to conduct a search of limitless scope and duration. **The scope of a search is controlled by the scope of consent given, which, in turn, is determined pursuant to a reasonable person standard under the circumstances** at the time the exchange between the officer and the suspect occurs. **The <u>burden is on law enforcement officials to conduct a search within those parameters</u>.** An individual is not required to police the police; absent another exception to the warrant requirement, **when a search exceeds the scope of an individual's given consent, the search is illegal** regardless of whether the individual objected or revoked his or her consent.

- 16 -

> *See generally* 68 Am. Jur. 2d *Searches and Seizures* § 271 ("A general consent to a search on its own does not give an officer unfettered search authority. Even when an individual gives a general consent without express limitations, the scope of a permissible search has limits: it is constrained by the bounds of reasonableness and what the reasonable person would expect.").

*Valdivia*, 195 A.3d at 868 (emphases added; paragraph formatting modified).

Another limited exception to the warrant requirement is the plain view doctrine, under which

> the police may effectuate a warrantless seizure of an item if: (1) the police view the item from a lawful vantage point; (2) the incriminating nature of the item is immediately apparent; and (3) the police have a lawful right of access to the item.

*Saunders*, 326 A.3d at 897 (citations and footnote omitted); *see also Commonwealth v. McCree*, 924 A.2d 621, 627 (Pa. 2007) (distinguishing the limited intrusion of the seizure of evidence in plain view from the greater intrusion of an automobile search). "In determining whether the incriminating nature of an object is immediately apparent to the police officer," a trial court must "look to the totality of the circumstances. An officer can never be one hundred percent certain that [suspected contraband] in plain view is incriminating, but his belief must be supported by probable cause." *Commonwealth v. Smith*, 285 A.3d 328, 333 (Pa. Super. 2022) (citation omitted). When reviewing whether an object's criminal nature is immediately apparent, probable cause

> merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that [an object is incriminating]; it does not demand any showing that such a belief be correct or more likely true than false. A practical, non-

technical probability that incriminating evidence is involved is all that is required.

*Id.* (citation omitted).

Instantly, in its opinion, the suppression court determined it properly suppressed the narcotics seized from Appellee's vehicle, reasoning as follows:

[The suppression] court, in its analysis, **credited the Troopers' testimony that** [] **Appellee asked them to obtain his <u>key and cell phone</u>** when EM[S personnel] determined that he needed medical attention at a hospital. The court finds that [] Appellee was the owner/operator of the vehicle, and that he had an expectation of privacy to said vehicle.[11]

The question for the court becomes does the consent [Appellee] provided permit the unfettered and unrestricted search of his vehicle by law enforcement for his key and cell phone? To put it another way, what was the scope of the consent by the "objective reasonableness" of what a person in [Appellee's] position believes they are consenting to? [] **Appellee was not under arrest or investigation per the Troopers' testimony at the suppression hearing, and** [] **Appellee had not exhibited signs of having any weapons or being a danger to others.** It was only after medical personnel on scene determined that [] Appellee needed to leave for the hospital that the search of his car occurred. Thus, in a situation where an individual is not under arrest, is under medical distress, and is seeking his car key and cell phone, what is the reasonable limit of his consent? **The** [**suppression**] **court found that <u>it was not an unlimited consent</u>, and that searching the black plastic bag in the back of** [**Appellee's**] **car, whose contents were not visible until the bag was opened, exceeded that scope of reasonable consent to search for car keys and a cell phone.**

_____

[11] It is undisputed that Appellee had a reasonable expectation of privacy in his vehicle.

Suppression Court Opinion, 4/1/25, at 4-5 (emphasis and footnote added; punctuation modified).

The suppression court additionally found that

[u]sing the reasonable person standard under these circumstances, this court finds that **it is not reasonable that law enforcement would have had carte blanche to search [Appellee's] entire vehicle for the requested items**,[12] notwithstanding the altruistic nature of the search. Further, **the [suppression] court does not find that a reasonable person would consent to all items within the vehicle being searched by police to find car keys.** Specifically, it does not appear reasonable that car keys would be inside what was described as a black[] plastic grocery bag. **That <u>the contents of said bag were not immediately apparent without manipulating or opening the bag,</u> means that the contents were not in plain view.** This court finds looking into the bag exceeds the scope of the consent given by [Appellee], and that the contents of the black bag were not in plain view.

*Id.* at 7-8 (emphasis and footnote added); *see also id.* at 10 (suppression court finding that "[e]ven if [] Trooper [Shutter] was viewing the black plastic bag lawfully, **its contents were not visible to the Trooper until he physically opened the bag up**, as he testified to at the suppression hearing." (citing N.T., 2/10/25, at 43-44) (emphasis added)).

Our review confirms that the suppression court's foregoing analysis is supported by the record and the law, and we agree with its determination. *See id.* at 4-5, 7-8, 10. As explained *supra*, the suppression hearing

---

[12] The suppression court also found, in its order denying the Commonwealth's motion for reconsideration, that "[i]t is not in [the suppression] court's opinion that the black bag in the back of [Appellee's] vehicle would be a commonsense place to look for car keys." Order, 2/24/25, at 1 n.1.

testimony established that (1) Appellee asked the Troopers to retrieve only his phone and keys from his vehicle; (2) the Troopers did not ask for, nor did Appellee give, consent to search his entire vehicle; (3) the plastic bag was opaque and its contents were not immediately apparent as contraband, prior to Trooper Shutter opening the bag; and (4) the Troopers "didn't go back and ask" Appellee whether they had his permission to "open any packages in the vehicle[,]" following the Troopers' initial inability to locate Appellee's keys. *See* N.T., 2/10/25, at 11, 18, 26-27, 40, 43-44. Keeping in mind our deferential standard of review, we agree with the suppression court that the Troopers unlawfully (1) exceeded the scope of Appellee's limited permission to retrieve certain items from his vehicle; and (2) opened the opaque plastic bag, the contents of which were not in plain view, while searching Appellee's vehicle. *Valdivia*, 195 A.3d at 862; *Saunders*, 326 A.3d at 897.

Moreover, the suppression court correctly rejected the Commonwealth's argument that the court improperly relied upon *Newman*:

> *Newman* did not involve a consent to search case—it involved a law enforcement officer manipulating a black plastic bag in a vehicle and the question of whether the firearm seized from said bag was immediately apparent to the officer and whether the plain view doctrine applied. [*See generally Newman*, 84 A.3d 1072.] [In the instant case, the suppression] court specifically noted, in its denial of the Commonwealth's Motion for Reconsideration, that the *Newman* case was instructive to [the] court on how to interpret [Trooper Shutter's] actions towards the black plastic bag in the present case. [*See* Order, 2/24/25, at 1 n.1.] [**The suppression**] **court did not rely upon *Newman* in determining the issue of consent in this case**—as clearly stated in this court's February 24, 2025 Order[. *Id.* F]or the issue of consent, [the court] relied upon *Valdivia*, 195 A.3d [at] 868

- 20 -

(failure to limit or revoke consent does not allow an officer carte [blanche to conduct] a limitless search)….

The Commonwealth[] … fails to note the other cases [that the suppression] court relied upon for consent, and fails to address the **Newman** [C]ourt's reasoning regarding the application of the plain view doctrine. Therefore, [the suppression] court respectfully requests that the Superior Court find this court's reliance upon **Newman**, for interpretating how to apply the facts in the present case to the plain view doctrine, as within the proper discretion of the court, noting [the suppression court's] reliance upon other case law regarding the issue of consent.

Suppression Court Opinion, 4/1/25, at 11-12 (emphasis added; punctuation and some citations modified). The suppression court's cogent analysis is supported by the record and the law; we determine it properly applied **Newman**. **See id.**

Based upon the foregoing, we conclude the Commonwealth's first two issues, asserting improper suppression of the narcotics, lack merit.

In its third and final issue, the Commonwealth claims the suppression court erred in suppressing evidence of the straw, which Trooper Shutter seized from Appellee's person during a lawful, protective pat-down search for weapons. **See** Commonwealth's Brief at 43-51. The Commonwealth contends "the Troopers had probable cause to arrest" Appellee for driving under the influence (DUI) of a controlled substance, "where [Appellee] admitted that he had ingested an illegal controlled substance and subsequently drove his vehicle." **Id.** at 43.

[Trooper Shutter] lawfully conducted a pat-down for safety concerns[,] where [the Troopers] had probable cause to arrest

[Appellee] for DUI. The probable cause to establish the DUI arose from [Appellee's] own admission to driving from Philadelphia after ingesting ecstasy.

*Id.* at 45-46 (emphasis omitted). The Commonwealth correctly points out that Pennsylvania law classifies ecstasy as a Schedule I controlled substance, and that 75 Pa.C.S.A. § 3802(d)(1) "prohibits one from driving if there is any amount of a Schedule I controlled substance, … or any amount of a metabolite of a controlled substance in one's blood." *Id.* at 46-47 (quoting *Commonwealth v. Griffith*, 32 A.3d 1231, 1239 (Pa. 2011) (emphasis omitted)). According to the Commonwealth, "a reasonably prudent man in [Trooper Shutter's] circumstances would be warranted in the belief that his safety or that of others, here the EMS [personnel], was in danger[;] thus, the Trooper [could lawfully] conduct a protective pat-down search." *Id.* at 51 (citation and brackets omitted).

Appellee counters the Commonwealth waived its challenge to suppression of the straw, where it did not raise this claim prior to the suppression court's grant of the suppression motion. *See* Appellee's Brief at 27-36. "Since the Commonwealth did not present its probable cause argument to the suppression court, the Commonwealth cannot make this argument for the first time on appeal." *Id.* at 30.

Preliminarily, we address whether the Commonwealth preserved this issue for our review. "The issue of waiver presents a question of law, and, as

- 22 -

such, our standard of review is *de novo*, and our scope of review is plenary."

**Smith**, 304 A.3d at 39 (citation omitted).  It is established that

> [i]ssue preservation is foundational to proper appellate review.  By requiring that an issue be considered waived if raised for the first time on appeal, our courts ensure that the trial court that initially hears a dispute has had an opportunity to consider the issue.  This jurisprudential mandate is also grounded upon the principle that a trial court must be given the opportunity to correct its errors as early as possible.  Related thereto, we have explained in detail the importance of this preservation requirement[,] as it advances the orderly and efficient use of our judicial resources.  Finally, concepts of fairness and expense to the parties are implicated as well.

**Commonwealth v. Miller**, 80 A.3d 806, 811 (Pa. Super. 2013) (citation and ellipses omitted).

Instantly, we are guided by our decision in **Smith**.  In that case, police arrested Smith and charged her with drug-related crimes, following their execution of a search warrant at her residence, and their seizure of narcotics. **Smith**, 304 A.3d at 37.  Smith filed a pre-trial motion to suppress evidence. **Id.**  Prior to ruling on the motion, the suppression court ordered the parties to file briefs detailing their respective arguments.  **Id.**  The Commonwealth complied and filed a brief arguing certain legal theories, including that Smith had no reasonable expectation of privacy in the contraband seized.  **Id.**  The suppression court granted Smith's suppression motion, finding the Commonwealth committed certain constitutional violations (which are not pertinent to our discussion).  **Id.** at 37-38.  The Commonwealth timely filed a motion for reconsideration.  **Id.** at 38.  Significantly, in its motion for

reconsideration, the Commonwealth, "[**f**]**or the first time**, [] presented an alternative theory for admitting the evidence at trial — the doctrine of inevitable discovery." **Id.** (citation omitted; emphasis added); **see also Commonwealth v. Brinson**, 328 A.3d 1096, 1107 (Pa. Super. 2024) ("The inevitable discovery doctrine provides: Evidence which would have been discovered was sufficiently purged of the original illegality to allow admission of the evidence[.]" (citations and brackets omitted)). The suppression court denied the motion for reconsideration, after which the Commonwealth filed an interlocutory appeal. **Id.**

On appeal, the Commonwealth argued, *inter alia*, that the suppression court erred in failing to admit the challenged evidence under the inevitable discovery doctrine. **Id.** Smith countered that the Commonwealth had waived this claim, where it failed to raise the claim before the suppression court, prior to filing its motion for reconsideration. **Id.** This Court agreed the Commonwealth waived its claim. **See id.** at 39-41. We applied our prior decision in **Commonwealth v. Skipper**, 277 A.3d 617 (Pa. Super. 2022), and reasoned the claim was waived, where

> the Commonwealth waited until **after** the suppression court had ruled on the motion to suppress to raise a new theory of inevitable discovery. Thus, the Commonwealth "waived [this] claim on appeal, because it failed to meet its initial burden, and, instead, conceded" the exclusionary rule applied to the evidence if unconstitutionally seized. **Id.** at 621.

**Smith**, 304 A.3d at 40 (emphasis in original); **see also Skipper**, 277 A.3d at 621-22 (holding the Commonwealth had waived, for appellate review, a

theory that the defendant had no reasonable expectation of privacy in a vehicle that police searched, where the Commonwealth did not raise this theory at the suppression hearing, or in a post-hearing brief, but instead presented it, for the first time, in a motion for reconsideration filed "**after** the trial court had already granted the suppression motion." (emphasis in original)).

Instantly, the Commonwealth failed to previously raise its claim that the suppression court improperly suppressed the straw because the Troopers had probable cause to arrest Appellee for DUI.[13] In this regard, the record supports Appellee's following argument:

> At the suppression hearing, the Commonwealth did not argue that the pat-down was lawful because the police had probable cause to arrest [Appellee] for [DUI] or for any other crime. By contrast, the Commonwealth argued that the encounter "never escalated to any inkling of being criminal." N.T., 2/10/25, p. 87. Trooper Shutter testified that he had no suspicion of criminal activity until he found what he believed to be drugs in [Appellee's] vehicle. *Id.* at 53.

Appellee's Brief at 29-30. We agree. Accordingly, based upon **Smith** and **Skipper**, the Commonwealth waived this claim.

---

[13] The suppression court did not address the Commonwealth's claim in its Rule 1925(a) opinion.

Even if not waived, however, we would have determined that the Commonwealth's claim related to the pat-down search[14] lacks merit.

It is well-established that the police may conduct a pat-down search (or "***Terry***[15] frisk") under the following circumstances:

> "If, during the course of a valid investigatory stop, an officer observes unusual and suspicious conduct on the part of the individual which leads him to reasonably believe that the suspect may be armed and dangerous, the officer may conduct a pat-down of the suspect's outer garments for weapons." ***Commonwealth v. E.M./Hall***, 735 A.2d 654, 659 (Pa. 1999). In order to establish reasonable suspicion, **the police officer must articulate specific facts from which he could reasonably infer that the individual was armed and**

_____

[14] In its Rule 1925(b) concise statement, the Commonwealth raised the following claim regarding the pat-down search:

> The [suppression] court erred as a matter of law in finding that Trooper Shutter's pat[-]down search of [Appellee] to ensure the safety of … EMT[ personnel], where the pat-down was a routine practice [*sic*]. Consequently, the [suppression] court erred in suppressing evidence of the straw found in [Appellee's] pocket. ***See Commonwealth v. Rehmeyer***, 502 A.2d 1332, 1338 (Pa. Super. 1985).

Concise Statement, 4/13/25, ¶ 10 (citation modified; paragraph enumeration omitted).

[15] ***Terry v. Ohio***, 392 U.S. 1 (1968). In ***Terry***, the Supreme Court held, *inter alia*, held that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a pat-down search "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." ***Id.*** at 24. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." ***Commonwealth v. Simmons***, 17 A.3d 399, 403 (Pa. Super. 2011) (quoting ***Adams v. Williams***, 407 U.S. 143, 146 (1972)).

> **dangerous.** *See **Commonwealth v. Gray**,* 896 A.2d
> 601, 606 (Pa. Super. 2006). When assessing the validity
> of a **Terry** [frisk], we examine the totality of the
> circumstances, *see id.*, giving due consideration to the
> reasonable inferences that the officer can draw from the
> facts in light of his experience, while disregarding any
> unparticularized suspicion or hunch. *See
> **Commonwealth v. Zhahir**,* 751 A.2d 1153, 1158 (Pa.
> 2000).

> ***Commonwealth v. Wilson**,* 927 A.2d 279, 284 (Pa. Super.
> 2007).

***Commonwealth v. Bozeman**,* 205 A.3d 1264, 1274 (Pa. Super. 2019)

(citations modified; emphasis added). "To conduct a pat down for weapons,

… **the officer must reasonably believe that his safety or the safety of**

**others is threatened**." *Simmons*, 17 A.3d at 403 (emphasis added); *see*

*also **Commonwealth v. Mack**,* 953 A.2d 587, 591 (Pa. Super. 2008) ("An

overt threat by the suspect or clear showing of a weapon is not required for a

[**Terry**] frisk.").

Instantly, in its Rule 1925(a) opinion, the suppression court addressed

the Commonwealth's challenge to its suppression of the straw, and invocation

of this Court's decision in **Rehmeyer**, stating as follows:

> [T]he search provided for and upheld in **Rehmeyer** occurred
> where the police had probable cause to arrest the defendant.
> [**Rehmeyer**, 502 A.2d at 1338-39 (holding police had probable
> cause to conduct a lawful **Terry** frisk, and that the suppression
> court properly denied Rehmeyer's motion to suppress contraband
> police recovered as a result of the **Terry** frisk, where the police
> officer, who initiated a traffic stop of Rehmeyer's vehicle for
> suspicion of DUI and subsequently provided Rehmeyer a ride
> home in the officer's patrol car, had a "reasonable belief that there
> was a substantial possibility Rehmeyer possessed items which
> could be used to attack [the officer] within the confines of the

patrol car."); **see also id.** at 1338 (holding the "search was fully justified by the probable cause to arrest [Rehmeyer] for [DUI] and [the police officer's] reasonable suspicion that [Rehmeyer] could be potentially dangerous.").] **At the point of the pat-down in the present case, there was no probable cause to arrest [Appellee] for anything.** N.T. 2/10/2025, pg. 22.

[At Appellee's suppression hearing, the following exchange occurred on direct examination of Trooper Shutter, regarding the pat-down search:]

Q [The prosecutor]:  At that point in time, was [Appellee] under arrest for anything?

A [Trooper Shutter]: No.

[**Id.**]  And then further, after the pat-down occur[ed]:

Q [The prosecutor]: At that point, Trooper Shutter, was [Appellee], again, under arrest for anything?

A: No.

Q: Was he ever put in handcuffs?

A: No.

Q: Were you restraining him at all at that point in time?

A: No.

**Id.**, pg. 25.

Further, [] **Trooper [Shutter] had no suspicion that [Appellee] had any weapons on him.** **Id.**, pg. 38. Trooper Shutter testified that before the EM[S personnel] transported [Appellee] to the hospital, he conducted a pat-down of [Appellee] to make sure [he] did not have a weapon. **Id.**, pgs. 38-39. Trooper Shutter stated that is [his] **standard procedure**, to ensure the safety of everyone in the ambulance. **Id.** Trooper Matthews testified that [**Appellee**] **was not combative**. **Id.**, pg. 11[; **see also id.** at 27 (Trooper Shutter testifying that Appellee's demeanor was calm)].

In this case, **there was no reasonable belief that [Appellee] was armed and dangerous. Thus, the pat-down was unlawful.** Without probable cause to arrest, or without reasonable suspicion that [Appellee] had weapons on him, the pat-down was illegal and unconstitutional[; accordingly,] the item[] seized, namely the straw, was properly suppressed.

Suppression Court Opinion, 4/1/25, at 16-17 (some brackets omitted; emphasis added; punctuation, paragraph formatting, and citation format modified).

The suppression court's foregoing analysis is supported by the record and the law, and we agree with its determination. *See id.* Accordingly, even if not waived, we would have determined that the Commonwealth's final issue does not merit relief; suppression of the straw was proper.

Based upon the foregoing, we conclude the suppression court did not err or abuse its discretion in granting Appellee's suppression motion.

Order affirmed.

Judge Olson joins the opinion.

P.J.E. Ford Elliott files a dissenting opinion.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/19/2025